# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,
the Commonwealth of MASSACHUSETTS,
the States of CALIFORNIA, COLORADO,
DELAWARE, FLORIDA, GEORGIA,
HAWAII, ILLINOIS, INDIANA, IOWA,
LOUISIANA, MARYLAND, MICHIGAN,
MINNESOTA, MONTANA, NEVADA, NEW
JERSEY, NEW MEXICO, NEW YORK,
NORTH CAROLINA, OKLAHOMA, RHODE
ISLAND, TENNESSEE, TEXAS, VERMONT,
and WASHINGTON, the Commonwealth of
VIRGINIA, and THE DISTRICT OF
COLUMBIA,

    *Plaintiffs*,

     *ex rel*.


  [UNDER SEAL]

    *Plaintiff-Relator*,

v.

  [UNDER SEAL]    ,

    *Defendants*.

Case No.  17-CV-10192-MLW

**JURY TRIAL DEMANDED**

**AMENDED COMPLAINT**

**Filed Ex Parte and Under Seal pursuant to the False Claims Act, 31 U.S.C. § 3730 (b)(2), and other similar state and local statutory provisions**


# FILED EX PARTE AND UNDER SEAL

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,
the Commonwealth of MASSACHUSETTS,
the States of CALIFORNIA, COLORADO,
DELAWARE, FLORIDA, GEORGIA,
HAWAII, ILLINOIS, INDIANA, IOWA,
LOUISIANA, MARYLAND, MICHIGAN,
MINNESOTA, MONTANA, NEVADA, NEW
JERSEY, NEW MEXICO, NEW YORK,
NORTH CAROLINA, OKLAHOMA, RHODE
ISLAND, TENNESSEE, TEXAS, VERMONT,
and WASHINGTON, the Commonwealth of
VIRGINIA, and THE DISTRICT OF
COLUMBIA,

         *Plaintiffs*,

         *ex rel.*

PAUL NEE,

         *Plaintiff-Relator*,

    v.

BIOGEN, INC., PATIENT ACCESS
NETWORK FOUNDATION, GOOD DAYS,
HEALTHWELL FOUNDATION,
MCKESSON CORPORATION, US
BIOSERVICES CORPORATION, THE LASH
GROUP, INC., AMERISOURCEBERGEN
CORPORATION, XCENDA,
CVS/CAREMARK, ACCREDO HEALTH
GROUP, INC., OPTUM RX PHARMACY,
INC., WALGREENS SPECIALTY
PHARMACY, LLC, ACARIAHEALTH INC.
ADVANCED CARE SCRIPTS, INC.,
OMNICARE, INC., PRIME THERAPEUTICS
SPECIALTY PHARMACY LLC, CIGNA
TEL-DRUG, CURASCRIPT, INC., HUMANA

Case No. 17-CV-10192-MLW

**JURY TRIAL DEMANDED**

**AMENDED COMPLAINT**

**Filed Ex Parte and Under Seal pursuant
to the False Claims Act, 31 U.S.C. §
3730 (b)(2), and other similar state and
local statutory provisions**

# FILED EX PARTE
# AND UNDER SEAL

PHARMACY, INC., AETNA SPECIALTY PHARMACY LLC, DIPLOMAT PHARMACY, INC., KROGER SPECIALTY PHARMACY, ASEMBIA SPECIALTY PHARMACY SUMMIT LLC, ICORE HEALTHCARE, LLC, and US SPECIALTY PHARMACY, INC.,

*Defendants*.

# I.    INTRODUCTION

1.      Since at least 2009, Defendant Biogen, Inc. ("Biogen"), a large Massachusetts pharmaceutical company, has reaped hundreds of millions of dollars a year in illegal profit, at the expense of taxpayers, by engaging in a kickback scheme that uses its free-drug program and so-called financial assistance charities as conduits to induce and steer thousands of chronically ill patients with multiple sclerosis and hemophilia on to its costly drugs.  Many of these drugs are paid for by government health care programs, including, but not limited to Medicare and state Medicaid programs (the "Government Programs").[1]  Federal law plainly prohibits pharmaceutical companies from paying a patient's co-payment obligations under the Government Programs.  But that prohibition has not deterred Biogen.

2.      Biogen is eager to capture every newly treated patient with multiple sclerosis or hemophilia because it knows that newly treated patients will likely continue their initial treatment with a particular drug, all things being equal, but that 70% of them will change prescriptions if they are unable to obtain financial assistance.  Biogen induces patients, many of whom are making serious medication decisions, to choose Biogen's drugs through the promise of free drugs for life.  Specifically, Biogen provides kickbacks in the form of free drugs to virtually any patient unable or unwilling to pay their co-payments and other cost-sharing obligations (referred to collectively as "copays") for months or even a year.  These free drugs, which cost Biogen very little to make, are distributed almost exclusively by Defendant US Bioservices Corporation ("US Bioservices"),

---

[1] Other Government Programs include TRICARE (formerly CHAMPUS), VA health care benefits, the Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA"), the Federal Employee Health Benefits Program ("FEHBP"), and the employee health care programs provided by the State Plaintiffs.

a specialty pharmacy[2] and subsidiary of Defendant AmerisourceBergen Corporation.

3.  As soon as patients are approved to receive free Biogen drugs, Biogen works to identify those who are eligible for coverage under the Government Programs.[3]  Each year, thousands of such eligible patients are targeted for a "sweep" off the free drug program and on to Government Programs.  Once identified, Biogen contacts patients to obtain their permission to be swept to a Government Program.  Patients are informed that the change will not cost them any money.

4.  In April 2013, for example, Biogen implemented a "Quick Start" scheme to maximize the launch uptake of MS drug Tecfidera. Under this scheme, McKesson expedited the shipment of free Tecfidera to patients with Government coverage with the goal of eventually "sweeping" the patient to a Government plan. "Quick Start" was aggressively marketed and thousands of Medicare Part D patients participated and were eventually "swept."

5.  To ensure a smooth move to the Government Programs, without risk of out-of-pocket expenses, McKesson and Biogen coordinate with US Bioservices to ship an extra 60- or 90-day shipment prior to the sweep.  Further, because US Bioservices distributes only free drugs, patients must move to another specialty pharmacy ("SPP").  Accordingly, US Bioservices coordinates with other SPPs and related entities including Defendants The Lash Group, Inc., AmerisourceBergen Corporation, Xcenda, CVS/Caremark, Accredo Health Group, Inc., Optum Rx Pharmacy, Inc., Walgreens Specialty Pharmacy, LLC, Acariahealth Inc., Advanced Care

---

[2] A specialty pharmacy is a pharmacy that handles all service requirements, including dispensing, distribution, and reimbursement, for so-called "specialty" pharmaceuticals, generally high-cost drugs used to treat rare and/or chronic illnesses such as cancer, rheumatoid arthritis, multiple sclerosis, and hemophilia.

[3] At one point, Defendant McKesson performed many of these Patient Services activities, including benefits investigations and contacting patients for consent, on behalf of Biogen for the drug Tecfidera.

Scripts, Inc., Omnicare, Inc., Prime Therapeutics Specialty Pharmacy LLC, Cigna Tel-Drug, CuraScript, Inc., Humana Pharmacy, Inc., Aetna Specialty Pharmacy LLC, Diplomat Pharmacy, Inc., Kroger Specialty Pharmacy, Asembia Specialty Pharmacy Summit LLC, ICORE Healthcare, LLC, and U.S. Specialty Pharmacy, Inc. (collectively, with US Bioservices and McKesson, the "SPP Defendants"), to expedite processing patients' prescriptions under the Government Programs. For example, toward the end of 2014 Biogen's Patient Services coordinated with Defendant ACS to send them most or all of the patients to be swept.

6. With limited exceptions,[4] when the SPPs submit a claim for reimbursement to the Government Programs, they are required to collect the patient's copay. Biogen, however, has already ensured that copays are covered. In a direct *quid pro quo*, Biogen donates hundreds of millions of dollars to 501(c)(3) charities that purportedly provide patient financial assistance ("Charity PAPs"). These Charity PAPs include, but are not limited to, Defendants Patient Access Network Foundation ("PANF"), Good Days ("GD," formerly Chronic Disease Fund), and Healthwell Foundation ("HF"). In exchange for the donations, the Charity PAPs agree to cover the copays of the patients Biogen sweeps to Government Programs.

7. The sweep process is carefully timed and orchestrated between the Charity PAPs, the SPP Defendants, and Biogen to ensure a seamless transition from the free-drug program to charity copay assistance and, thus, no patient is ever required to outlay any costs for their drugs. The Charity PAPs also provide extremely detailed information to pharmaceutical companies in the form of dashboards and regular status reports pursuant to their contractual arrangements. The data provided allow Biogen to correlate its funding and actions and to direct its charity donations specifically to patients taking their products.

---

[4] *See* 81 F.R. at 88371 (HHS OIG Dec. 7, 2016).

8.     The purpose of all this conduct is to induce the purchasing, ordering, arranging for or recommending purchasing or ordering of Biogen goods for which payment was made by Government Programs, in violation of the Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b), and state analogs and the False Claims Act, 31 U.S.C. § 3729 *et seq.*, and state analogs.   Patients are not driven by copays to choose the best drug for the price.  Instead they choose drugs because they are free and will remain free (to them).   Thus, Biogen has reaped billions of dollars for drugs of questionable efficacy.

9.     Indeed, Biogen anticipated as high as a 90% yield for its donations (meaning that 90% of its donations to these charities would be steered to Biogen patients).   Further, Biogen performed "return on investment" analyses ("ROI") that showed the company expected as much as $18 in revenue for every $1 donated to a Charity PAP.   In 2014, alone, Biogen spent more than $1 billion on patient financial assistance and free drug programs.   By engaging in this scheme, Biogen receives a windfall of billions of dollars each year from the Government Programs, which are desperately trying to allocate scarce resources.

10.     The Government Programs do not cover claims for drugs where there is a kickback involved in the underlying transaction.   This is because such arrangements have the potential for "steering beneficiaries to particular drugs; increasing costs to Medicare; providing a financial advantage over other competing drugs; and reducing beneficiaries [sic] incentives to locate and use less expensive, equally effective drugs."   OIG Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees, 70 F.R. 70623 (HHS OIG Nov. 22, 2005).   In particular, kickbacks can induce patients to take – and doctors to prescribe – drugs that are not medically necessary and may place the patient at unnecessary risk.   A violation of the Anti-Kickback Statute also constitutes a false or fraudulent claim under the federal False Claims Act.   *See* 42 U.S.C. §

1320(a)-7b(g).  Thus, claims submitted to Government Programs where a kickback is involved in the underlying transaction are false within the meaning of the FCA and state analogs as a matter of law.

11.     Moreover, by statute, the Government Programs may only reimburse a portion of the actual cost of a prescription (generally 80%).  When a patient's copays are not collected, the Government Programs pay a larger proportion (100%) of the actual cost – more than the Government Programs owe.

12.     Biogen, the Charity PAP Defendants, and the SPP Defendants knowingly caused the Government Programs to pay for claims for prescriptions of Biogen drugs that they otherwise would not have paid.

## II.     JURISDICTION AND VENUE

13.     Plaintiff-Relator Paul Nee ("Relator") brings this action on behalf of himself and the United States, for violations of the False Claims Act, 31 U.S.C. §§ 3729-3733, and on behalf of the Commonwealth of Massachusetts, for violations of the Massachusetts False Claims Act, Mass. Ann. Laws ch. 12, § 5B *et seq*., the states of California, for violations of the California False Claims Act, Cal. Gov't Code § 12651 *et seq*., Colorado, for violations of the Colorado Medicaid False Claims Act, Colo. Rev. Stat. §§ 25.5-4-303.5, *et seq*., Delaware, for violations of the Delaware False Claims and Reporting Act, 6 Del. C. § 1201 *et seq*., Florida, for violations of the Florida False Claims Act, Fla. Stat. Ann. § 68.081 *et seq*., Georgia, for violations of the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq*., Hawaii, for violations of the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq*., Illinois, for violations of the Illinois False Claims Act, 740 ILCS 175/1 *et seq*., Indiana, for violations of the Indiana False Claims and Whistleblower Protection Act, Burns Ind. Code Ann. § 5-11-5.5-1 *et seq*., Iowa, for violations of the Iowa False Claims Act, Iowa Code 685 *et seq*., Louisiana, for violations of the Louisiana

Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:437.1 *et seq*., Maryland, for violations of the Maryland False Claims Act, Md. Code Ann., Health–Gen. § 2-601 *et seq*., Michigan, for violations of the Michigan Medicaid False Claims Act, Mich. Comp. Laws Serv. § 400.601 *et seq*., Minnesota, for violations of the Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq*. , Montana, for violations of the Montana False Claims Act; Mont. Code Anno. § 17-8-401 *et seq*., Nevada, for violations of the Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 *et seq*., New Jersey, for violations of the New Jersey False Claims Act; N.J. Stat. § 2A:32C-1 *et seq*., New Mexico, for violations of the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq*., New York, for violations of the New York False Claims Act, N.Y. State Fin. Law § 187 *et seq*., North Carolina, for violations of the North Carolina False Claims Act, N.C.G.S. § 1-605 *et seq*., Oklahoma, for violations of the Oklahoma Medicaid False Claims Act, 63 Okl. St. § 5053 *et seq*., Rhode Island, for violations of the Rhode Island False Claims Act; R.I. Gen. Laws § 9-1.1-1 *et seq*., Tennessee, for violations of the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq*., Texas, for violations of the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq*., Vermont for violations of the Vermont False Claims Act, 32 V.S.A. § 632 *et seq*., and Washington, for violations of the Washington Medicaid Fraud False Claims Act, Rev. Code Wash. § 74.66 *et seq*., the Commonwealth of Virginia, for violations of the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq*., and the District of Columbia, for violations of the District of Columbia False Claims Act, D.C. Code § 2-381.01 *et seq*. (the "State Claims"), and, pursuant to 26 U.S.C. § 62(a)(20), seeks damages in connection with violations of 31 U.S.C. §§ 3729-3733 and the State Claims.

14.     Relator has provided a copy of the complaint, a written disclosure, and material information to the United States and each of the State Plaintiffs prior to the filing of this Complaint.

15. This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732 and supplemental jurisdiction over the State Claims pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b).

16. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in and transact business in this District. In addition, many acts prohibited by 31 U.S.C. § 3729 occurred in this District. 31 U.S.C. § 3732(a).

17. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this District and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this District.

18. Relator's claims and this Complaint are not based upon prior public disclosures of allegations or transactions in a Federal criminal, civil, or administrative hearing in which the Government is already a party, or in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation, or from the news media, as enumerated in 31 U.S.C. § 3730(e)(4)(A).[5] Nor are these claims based on any public allegations or complaints in which any of the State Plaintiffs are a party.

19. To the extent that there has been a public disclosure unknown to the Relator, the Relator is the "original source" under 31 U.S.C. § 3730(e)(4)(B). The Relator has direct and independent material knowledge of the information on which the allegations are based and has voluntarily provided the information to all of the Plaintiffs before filing this *qui tam* action based on that information. *Id.*

---

[5] To the extent that conduct alleged in this Complaint occurred prior to March 23, 2010, the prior versions of the False Claims Act are applicable (*i.e.*, 31 U.S.C. § 3730(e), as amended, October 27, 1986 and May 20, 2009).

## III.      PARTIES

### A. PLAINTIFFS

20.      Relator **Paul Nee** has spent the last 16 years working for large pharmaceutical and biotechnology companies, including Novartis, Amgen, Human Genome Sciences (later bought by GSK), Biogen, and now Inotek Pharmaceuticals.  Relator was the director of forecasting for all U.S. drugs for Biogen from October 2012 to April 2015.  His responsibilities included: (1) forecasting how much and what form of product to manufacture (including bulk, pen injectors, and pre-filled syringes); (2) forecasting revenue, both short and long-term (these projections depended heavily on the scheduled sweeps discussed below); and (3) "Strategic Forecasting," which included forecasting the impact of marketing.

21.      Plaintiffs the United States of America (the "United States"), the Commonwealth of Massachusetts, the States of California, Colorado, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, and Washington, the Commonwealth of Virginia, and the District of Columbia (collectively, the "State Plaintiffs," and collectively with the United States, the "Plaintiffs"), are the real parties in interest to this action.

### B. DEFENDANTS

22.      Defendant **Biogen** is a Delaware corporation with its principal place of business at 225 Binney Street, Cambridge, MA 02142.  It is one of the largest biotechnology companies in Massachusetts, with a $60.7 billion market capitalization as of December 21, 2016, *see* http://www.nytimes.com/topic/company/biogen-idec-inc, and 2015 revenues greater than $10 billion, Biogen Inc. 10K for Dec. 31, 2015 ("2015 10K"), at 48, *available at* https://www.sec.gov/Archives/edgar/data/875045/000087504516000042/biib-

20151231x10k.htm (accessed Dec. 21, 2016).

23.    Defendant PANF, the **Patient Assistance Network Foundation**, is a 501(c)(3) organization located at 1331 F Street NW, Suite 975, Washington, DC 20004.  It provides financial assistance to patients for Biogen drugs Avonex, Tecfidera, and Tysabri.  *See* Pan Foundation – Medications                 Covered,                 available                 at https://www.panfoundation.org/index.php/en/patients/medications-covered  (accessed  Jan.  13, 2017).

24.    Defendant GD, **Good Days** (formerly the Chronic Disease Fund), is a 501(c)(3) organization located at 6900 Dallas Parkway, Suite 200, Plano, TX 75024.  It provides financial assistance to patients for Biogen drugs Avonex, Tecfidera, and Tysabri.  *See* Good Days – Diseases and  Medications,  available  at  https://www.mygooddays.org/for-patients/diseases-and-medications-covered/ (accessed Jan. 13, 2017).

25.    Defendant HF, the **HealthWell Foundation**, is a 501(c)(3) organization located at P.O. Box 220410, Chantilly, VA 20153-0410.  HF provides financial assistance specifically to Medicare patients for Biogen Drugs Avonex, Tecfidera, and Tysabri.  *See* Healthwell Foundation – Diseases  and  Medications,  available  at  https://www.healthwellfoundation.org/what-we-do/diseases-and-medications/ (accessed Jan. 13, 2017).

26.    Defendant **McKesson Corporation** is a Delaware corporation with its principal place of business at One Post Street, San Francisco, CA  94104. Among other things, it is a drug wholesaler and distributor.  It also provides patient support services for pharmaceutical companies.

27.    Defendant **US Bioservices Corporation** is a Delaware corporation with its principal place of business at 3200 Internet Blvd, Frisco, TX 75034.  It is a specialty pharmacy and a wholly owned subsidiary of Defendant AmerisourceBergen Corporation.

28.     Defendant **The Lash Group, Inc.** is a Delaware corporation with its principal place of business at 1800 Innovation Point, Fort Mill, SC 29715.  It is a healthcare consulting firm that focuses on patient support services and a wholly owned subsidiary of Defendant AmerisourceBergen Corporation.

29.     Defendant **AmerisourceBergen Corporation** is a Delaware corporation with its principal place of business at 1300 Morris Drive, Chesterbrook, PA 19087. It is a wholesale drug distribution company and provides drugs to retail pharmacies, hospitals, and healthcare providers.

30.     Defendant **Xcenda** is a subsidiary of AmerisourceBergen Corporation with its principal place of business at 1800 Innovation Point, Fort Mill, SC 29715.  It is a strategic consultancy company focusing on health economics and outcomes research, reimbursement, stakeholder insights, and market access consulting and communications.

31.     Defendant **CVS/Caremark**, formerly Caremark RX, is a Delaware corporation with its principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895.  It is a specialty pharmacy and a subdivision of CVS Health Corporation.

32.     Defendant **Accredo Health Group, Inc.** is a Delaware corporation with its principal place of business at 1640 Century Center Parkway, Memphis, TN 38134.  It is a specialty pharmacy and is an affiliate of Express Scripts.

33.     Defendant **Optum Rx Pharmacy, Inc.** is a Delaware corporation with its principal place of business at 11000 Optum Circle, Eden Prairie, MN 55344. It is a specialty pharmacy.

34.     Defendant **Walgreens Specialty Pharmacy, LLC** is an Illinois limited liability company with its principal place of business at 108 Wilmot Road, Deerfield, IL 60015. It is a specialty pharmacy and a subsidiary of Walgreens Boots Alliance, Inc.

35.     Defendant **AcariaHealth Inc.** is a Delaware corporation with its principal place of

business at 8427 Southpark Circle, Suite 400, Orlando, FL 32819.  It is a specialty pharmacy.

36.     Defendant **Advanced Care Scripts, Inc.** ("ACS") is a Florida corporation with its principal place of business at 6251 Chancellor Drive, Suite 101, Orlando, FL 32809.  It is a specialty pharmacy and a wholly owned subsidiary of Omnicare, Inc.

37.     Defendant **Omnicare, Inc.** is a Delaware corporation with its principal place of business at 900 Omnicare Center, 201 East Fourth Street, Cincinnati OH 45202.  It is a wholesale drug distributor, and distributes drugs to patients, providers, and hospitals. Omnicare is a subsidiary of CVS Health Corporation.

38.     Defendant **Prime Therapeutics Specialty Pharmacy LLC** is a Delaware limited liability company with its principal place of business in Eagan, Minnesota.  It is a specialty pharmacy.  It is a subdivision of Prime Therapeutics LLS and is affiliated with Walgreens.

39.     Defendant **Cigna Tel-Drug** is a subsidiary of Cigna Corporation, a Delaware corporation with its principal place of business at 900 Cottage Grove Road, Bloomfield, CT 06002. It is a mail order pharmacy.

40.     Defendant **CuraScript, Inc.** is a Delaware corporation with its principal place of business at 255 Technology Park, Lake Mary, FL It is a specialty pharmacy and a subsidiary of Express Scripts.

41.     Defendant **Humana Pharmacy, Inc.** is a Delaware corporation with its principal place of business at 500 West Main Street, Louisville, KY 40202.  It is a specialty pharmacy and a subsidiary of Humana Inc.

42.     Defendant **Aetna Specialty Pharmacy LLC** is a Delaware limited liability company with its principal place of business at 151 Farmington Avenue, Hartford, CT 06156.  It is a specialty pharmacy and a subsidiary of Aetna Inc.

43.     Defendant **Diplomat Pharmacy, Inc.** is a Michigan corporation with its principal place of business at 4100 S. Saginaw St., Flint, Michigan 48507.  It is a specialty pharmacy.

44.     Defendant **Kroger Specialty Pharmacy** (formerly Axium Healthcare Pharmacy, Inc.) is a Delaware corporation with its principal place of business at 550 Technology Park, Lake Mary, FL 32746.  It is a specialty pharmacy.

45.     Defendant **Asembia Specialty Pharmacy Summit LLC** (formerly Armada Health Care) is a Delaware limited liability company with its principal place of business at 200 Park Ave #300, Florham Park, NJ 07932.  It is a specialty pharmacy.

46.     Defendant **ICORE Healthcare, LLC** is a Delaware limited liability company with its principal place of business at 31-75 23rd Street, Suite 410, Astoria, NY  11106-4134.  It is a specialty pharmacy.

47.     Defendant **US Specialty Pharmacy, Inc.** is a Delaware corporation.  It is a specialty pharmacy and subsidiary of WelldyneRX, Inc., a Florida Corporation.

## IV.     STATUTORY AND REGULATORY PROVISIONS APPLICABLE TO DEFENDANTS' FALSE CLAIMS ACT VIOLATIONS

### A.  THE GOVERNMENT PROGRAMS

48.     The Government Programs are among the principal purchasers of Biogen's pharmaceutical products.  These programs include, but are not limited to, Medicare, the Medicaid programs of the State Plaintiffs, TRICARE (formerly CHAMPUS), VA health care benefits, the Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA"), the Federal Employee Health Benefits Program ("FEHBP"), and the employee health care programs provided by the State Plaintiffs.  The United States and the State Plaintiffs fund the Government Programs with taxpayer money.

49.     Medicare is a federal health program primarily benefiting the elderly that Congress

created in 1965 when it adopted Title XVIII of the Social Security Act. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"). As explained below, Medicare provides coverage for "reasonable and necessary" prescriptions through two programs, Medicare Part B, which primarily reimburses for physician-administered drugs, and Medicare Part D, which primarily reimburses for self-administered drugs. Biogen manufactures both types of drugs.

50. There are four parts to Medicare: Medicare Part A (hospital insurance); Medicare Part B (medical insurance); Medicare Part C (Medicare Advantage, formerly known as Medicare + Choice); and Medicare Part D (prescription drug coverage that was enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA") and went into effect on January 1, 2006).

51. Medicare Part A generally pays for inpatient services for eligible beneficiaries in hospitals, hospices and skilled nursing facilities, as well as some home healthcare services. 42 U.S.C. §§ 1395e - 42 U.S.C. §§ 1395i-5. Prescription drugs are covered under Medicare Part A only if they are administered on an inpatient basis in a hospital or similar setting.

52. Medicare Part B covers some healthcare services and products not covered by Medicare Part A, generally on an outpatient basis. Doctor's visits and other services are covered by Part B. Medicare Part B also pays for some types of prescription drugs that are not administered in a hospital setting. 42 U.S.C. § 1395k(a); 42 U.S.C. § 1395x(s)(2); 42 C.F.R. § 405.517. These typically include drugs administered by a physician or other provider in an outpatient setting, including some anticancer drugs. 42 U.S.C. § 1395k(a); 42 U.S.C. § 1395x(s)(2); 42 C.F.R. § 405.517.

53. Medicare Part C, in effect, combines both Part A and Part B. Part C differs, however, because it is supplied through private insurance companies. Medicare beneficiaries have

the option to receive their Medicare benefits through private health insurance plans, instead of through the original Medicare plan (Parts A and B). Originally, these programs were known as "Medicare+Choice" or "Part C" plans. Following the passage of the MMA – which created Part D – "Medicare+Choice" became known as "Medicare Advantage" ("MA") plans.

54. On January 1, 2006, Part D of the Medicare program began subsidizing optional drug coverage for all beneficiaries. This drug benefit covers drugs that are considered "covered outpatient drugs" under 42 U.S.C. § 1396r-8(k). Patients with Medicare Part D drug coverage have certain cost-sharing obligations. In particular, patients generally are obligated to pay a 20% co-payment as well as any coverage gap that may occur when certain spending thresholds are met (*i.e.*, the so-called donut-hole).

55. Congress created Medicaid at the same time it created Medicare in 1965 when Title XIX was added to the Social Security Act. Medicaid is a public assistance program providing payment of medical expenses to low-income patients. Funding for Medicaid is shared between the federal government and state governments and is derived from federal and state taxes. The federal government also separately matches certain state expenses incurred in administering the Medicaid program. While specific Medicaid coverage guidelines vary from state to state, Medicaid's coverage is generally modeled after Medicare's coverage, including both physician- and self-administered drugs. The State Plaintiffs have opted to include prescription drug coverage in their Medicaid plans.

56. TRICARE is the health care system of the United States military, administered by the Department of Defense. It is designed to maintain the health of active-duty service personnel, provide health care during military operations, and offer health care to non-active-duty beneficiaries, including dependents of active-duty personnel and career military retirees and their

dependents. The program operates through various military-operated hospitals and clinics worldwide and is supplemented through contracts with civilian health care providers. TRICARE is a triple-option benefit program designed to give beneficiaries a choice between health maintenance organizations, preferred provider organizations, and fee-for-service benefits. Five managed-care support contractors create networks of civilian health care providers. TRICARE is funded by federal taxes.

57.     Whereas TRICARE treats active duty military and their dependents and military retirees, the Veterans Administration ("VA") provides health care and other benefits to non-TRICARE-eligible veterans of the military through its nationwide network of hospitals and clinics. The VA health programs are funded by federal taxes.

58.     CHAMPVA is a health care program administered by the VA for families of veterans with permanent and total service-connected disabilities, including survivor benefits. CHAMPVA is funded by federal taxes.

59.     The Federal Employees Health Benefits Program ("FEHBP") provides health insurance coverage for more than 8 million federal employees, retirees, and their dependents. FEHBP is a collection of individual health care plans, including the Blue Cross and Blue Shield Association, Government Employees Hospital Association, and Rural Carrier Benefit Plan. FEHBP plans are managed by the Office of Personnel Management and are funded by federal taxes.

60.     The State Plaintiffs administer health care programs for their employees that are funded by state taxes. For example, New York offer its employees coverage under the New York State Employee Health Insurance Program, or NYSHIP. NYSHIP is funded by state taxes.

61.     Coverage of prescription drugs under these programs is similar to the coverage

provided by the Medicare and Medicaid programs. *See, e.g.*, TRICARE Policy Manual 6010.47-M, Chapter 7, Section 7.1 (B) (2) (March 15, 2002); CHAMPVA Policy Manual, Chapter 2, Section 22.1, Art. I (A)(2) (June 6, 2002).

## B. THE FALSE CLAIMS ACT AND STATE FALSE CLAIMS ACTS

62. The Federal False Claims Act provides that any person who knowingly presents or causes another to present a false or fraudulent claim for payment or approval is liable for a civil penalty of up to $11,000[6] for each such claim, plus three times the amount of the damages sustained by the government. 31 U.S.C. § 3729(a)(1)(A) & (B). Liability attaches to anyone who (1) presents or causes to be presented for payment or approval by the United States (2) a false or fraudulent claim, (3) knowing the claim was false or fraudulent. *See* 31 U.S.C. § 3729(b)(2).

63. A majority of states have enacted false claims acts or provisions that apply to Medicaid fraud and/or fraudulent health care claims submitted for payment by municipal funds (the "State False Claims Acts"), including:

- Massachusetts False Claims Act, Mass. Ann. Laws ch. 12, § 5B *et seq*.

- California False Claims Act, Cal. Gov't Code § 12651 *et seq*.

- Colorado Medicaid False Claims Act, Colo. Rev. Stat. §§ 25.5-4-303.5, *et seq*.

- Delaware False Claims and Reporting Act, 6 Del. C. § 1201 *et seq*.

- Florida False Claims Act, Fla. Stat. Ann. § 68.081 *et seq*.

- Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq*.

- Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq*.

- Illinois False Claims Act, 740 ILCS 175/1 *et seq*.

---

[6] For conduct that occurred after November 1, 2015, Defendants pay not less than $10,781.40 and not more than $21,562.80 for each violation of 31 U.S.C. § 3729 *et seq*. 82 FR 9131

- Indiana False Claims and Whistleblower Protection Act, Burns Ind. Code Ann. § 5-11-5.5-1 *et seq.*

- Iowa False Claims Act, Iowa Code 685 *et seq.*,

- Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:437.1 *et seq*.

- Maryland False Claims Act, Md. Code Ann., Health–Gen. § 2-601 *et seq*.

- Michigan Medicaid False Claims Act, Mich. Comp. Laws Serv. § 400.601 *et seq*.

- Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq*.

- Montana False Claims Act; Mont. Code Anno. § 17-8-401 *et seq*.

- Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 *et seq*.

- New Jersey False Claims Act; N.J. Stat. § 2A:32C-1 *et seq*.

- New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq*.

- New York False Claims Act, N.Y. State Fin. Law § 187 *et seq*.

- North Carolina False Claims Act, N.C.G.S. § 1-605 *et seq*.

- Oklahoma Medicaid False Claims Act, 63 Okl. St. § 5053 *et seq*.

- Rhode Island False Claims Act; R.I. Gen. Laws § 9-1.1-1 *et seq*.

- Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq*.

- Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq*.

- Vermont False Claims Act, 32 V.S.A. § 632 *et seq*.

- Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq*.

- Washington Medicaid Fraud False Claims Act, Rev. Code Wash. § 74.66 *et seq*.

- District of Columbia False Claims Act, D.C. Code § 2-381.01 *et seq*.

64.     The State False Claims Acts generally follow the federal FCA with respect to

liability and penalties.

### C. THE ANTI-KICKBACK STATUTE

65.     The Medicare-Medicaid Anti-Fraud and Abuse Amendments, known as the Anti-Kickback Statute (the "AKS"), 42 U.S.C. § 1320a-7b(b), provides criminal penalties for individuals or entities that knowingly and willfully offer, pay, solicit or receive remuneration to induce the referral of business reimbursable under a federal health benefits program. *See* 42 U.S.C. § 1320a-7b(b).   "Remuneration" is broadly defined to include anything of value directly or indirectly, overtly or covertly, in return for purchasing, ordering, or recommending the purchase or order of any reimbursable item. *Id.* The offense is a felony punishable by fines of up to $25,000 and imprisonment for up to 5 years.

66.     The Balanced Budget Act of 1997 amended the AKS to include administrative civil penalties of $50,000 for each act violating the AKS, as well as an assessment of not more than three times the amount of remuneration offered, paid, solicited, or received, without regard to whether a portion of that amount was offered, paid, or received for a lawful purpose. *See* 42 U.S.C. § 1320a-7a(a).

67.     The AKS contains statutory exceptions and certain regulatory "safe harbors" that exclude certain types of conduct from the reach of the statute. *See* 42 U.S.C. § 1320a-7b(b)(3); "Medicare and State Health Care Programs: Fraud and Abuse; Revisions to the Safe Harbors Under the Anti-Kickback Statute and Civil Monetary Penalty Rules Regarding Beneficiary Inducements," 81 FR 88368 (HHS OIG Dec. 7, 2016).  However, none of the statutory exceptions or regulatory safe harbors apply to the Defendants' conduct in this case and do not absolve their actions.

68.     The Patient Protection and Affordable Care Act ("ACA"), Public Law No. 111-148, Sec. 6402(g), amended the AKS and the Social Security Act, 42 U.S.C. § 1320a-7a(a), b(b),

to specifically allow violations of its provisions to be enforced under the False Claims Act. The ACA also amended the Social Security Act's "intent requirement" to make clear that violations of the Social Security Act's anti-kickback provisions, like violations of the False Claims Act, may occur even if an individual does "not have actual knowledge" or "specific intent to commit a violation." *Id*. at Sec. 6402(h). Thus, a violation of the AKS also constitutes a false or fraudulent claim under the FCA assuming certain additional statutory criteria are satisfied.

69.     The purpose of the AKS is to ensure proper medical treatment and referrals, and to limit unnecessary treatment, services, or goods that are based not on the needs of the patient but on improper incentives given by Biogen, thereby threatening proper medical care and services. Paying kickbacks taints an entire prescription, regardless of the medical propriety of its use. The kickback inherently interferes with the doctor-patient relationship and creates a conflict of interest, potentially putting the patient's health at risk.

### D. COPAYS AND PATIENT ASSISTANCE PROGRAMS

70.     Medicare covers 80% of the reasonable cost of medical services. 42 U.S.C. § 1395l(a)(1). Accordingly, the patient is normally required to contribute the remaining 20% as a co-pay.[7] The OIG has explained that

> [c]ost-sharing requirements for Federal health care program drugs serve an important role in protecting both Federal health care programs and their beneficiaries. These cost-sharing requirements promote: (1) prudent prescribing and purchasing choices by physicians and patients based on the true costs of drugs and (2) price competition in the pharmaceutical market.

OIG Special Advisory Bulletin, "Pharmaceutical Manufacturer Copayment Coupons," at 2 (HHS OIG     Sept.     2014)     (emphasis     added)     (available     at https://oig.hhs.gov/fraud/docs/alertsandbulletins/2014/SAB_Copayment_Coupons.pdf).

---

[7] Other Government Programs have similar coverage and copays.

71.     As noted above, with few exceptions, A failure to collect or pay a patient's co-pays also diminishes the "actual" charge, resulting in an overpayment by Medicare.  The Medicare Claims Processing Manual provides:

> Deductible and co-insurance amounts are taken into account (included) in determining the reasonable charge for a service or item. In this regard, a billed amount that is not reasonably related to an expectation of payment is not considered the "actual" charge for the purpose of processing a claim or for the purpose of determining customary charges.

Medicare Claims Processing Manual, Ch. 23, § 80.8.1, available at www.cms.hhs.gov/manuals/downloads/clm104c23.pdf.

72.     Like co-pay waivers, paying co-pays on behalf of patients can be considered remuneration to induce the use of specific products or services, in violation of the AKS.[8]  Thus, PAPs that defray co-pay and other cost-sharing for Medicare beneficiaries potentially run afoul of the AKS, the FCA, and the State False Claims Acts.

73.     Since at least 2003, the U.S. Department of Health and Human Services Office of the Inspector General ("OIG") has made clear that drug manufacturers are subject to special proscriptions, including the prohibition of directly or indirectly funding the cost-sharing obligations of patients who have government-sponsored medical coverage.  The OIG issued its Compliance Program Guidance for Pharmaceutical Manufacturers, 68 FR 23731 (HHS OIG May

---

[8] The so-called Beneficiary Inducement Civil Monetary Penalty ("CMP"), Section 1128A(a)(5) of the Social Security Act, 42 U.S.C. § 1320a-7a(a)(5), which precludes remuneration to a Government Program beneficiary that "is likely to influence the beneficiary to order or receive from a particular provider, practitioner, or supplier any item or service" paid for by the public payer may also be implicated by programs that provide coverage for co-payments and cost-sharing, but that provision is inapplicable to a drug manufacturer, which, according to OIG, is neither a provider, practitioner, nor supplier. OIG Advisory Op. 03-03, at 5 (HHS OIG Feb. 3, 2003) ("[A] pharmaceutical company [] manufactures, but does not bill Medicare or Medicaid, for the Drugs, and thus does not constitute 'a particular provider, practitioner, or supplier' within the meaning of section 1128A(a)(5) of the Act."), *available at* http://oig.hhs.gov/fraud/docs/advisoryopinions/2003/ao0303.pdf.

5, 2003) (the "2003 OIG Guidance"), which explained that "practices that may be common or longstanding in other businesses are not necessarily acceptable or lawful when soliciting federal health care program business," and that such practices would be illegal if "any *one* purpose of the remuneration [is] to induce or reward the referral or recommendation of business payable in whole or in part by a federal health care program. Importantly, a lawful purpose will not legitimize a payment that also has an unlawful purpose." *Id*. at 13, 14 (emphasis in original).

74. In addition, OIG issued OIG Advisory Opinion 03-03, which explained that drug manufacturers are "squarely prohibited" under the AKS from paying a Medicare Part B patient's cost-sharing obligations. OIG Advisory Op. 03-03, at 5 (HHS OIG Feb. 3, 2003), *available at* http://oig.hhs.gov/fraud/docs/advisoryopinions/2003/ao0303.pdf. The Advisory opinion explained that paying a patient's co-payments could be very profitable to a drug company while resulting in increased costs to Medicare. *Id*.

75. In 2005, the OIG issued the OIG Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees, 70 F.R. 70623 (HHS OIG Nov. 22, 2005) ("2005 SAB"), in which it reiterated that pharmaceutical companies are prohibited from directly or indirectly paying the cost-sharing obligations of patients receiving government-funded medical coverage:

> Consistent with our prior guidance addressing manufacturer cost-sharing subsidies in the context of Part B drugs, we believe such [pharmaceutical PAP] subsidies for Part D drugs would implicate the anti-kickback statute and pose a substantial risk of program and patient fraud and abuse. ***Simply put, the subsidies would be squarely prohibited by the statute, because the manufacturer would be giving something of value (i.e., the subsidy) to beneficiaries to use its product.*** Where a manufacturer PAP offers subsidies tied to the use of the manufacturer's products (often expensive drugs used by patients with chronic illnesses), the subsidies present all of the usual risks of fraud and abuse associated with kickbacks, including steering beneficiaries to particular drugs; increasing costs to Medicare; providing a financial advantage over competing drugs; and reducing beneficiaries=[sic] incentives to locate and use less expensive, equally effective drugs.

*Id*. at 70625 (emphasis added).

76. The 2005 SAB advised manufacturer PAPs to transition beneficiaries to other forms of assistance and explained steps manufacturer PAPs could take to reduce their exposure to fraud and abuse charges, but warned that "[n]otwithstanding a pharmaceutical manufacturer's compliance with the foregoing, *the Government will take enforcement action in cases where there is evidence of unlawful intent*." *Id*. at 70638 (emphasis added).

77. The 2005 SAB further advised that while drug manufacturers could donate funds to Charity PAPs to help ensure patients had access to and could afford their medically necessary drugs, the Charity PAP must be "*bona fide*" and operate independently from the pharmaceutical company donors: "[T]he independent Charity PAP must not function as a conduit for payments by the pharmaceutical manufacturer to patients and must not impermissibly influence beneficiaries' drug choices." *Id*. at 70627. The 2005 SAB set forth the following five criteria Charity PAPs should meet:

> (i) Neither the pharmaceutical manufacturer nor any affiliate of the manufacturer (including, without limitation, any employee, agent, officer, shareholder, or contractor (including, without limitation, any wholesaler, distributor, or pharmacy benefits manager)) exerts any direct or indirect influence or control over the charity or the subsidy program;

> (ii) The charity awards assistance in a truly independent manner that severs any link between the pharmaceutical manufacturer's funding and the beneficiary (i.e., the assistance provided to the beneficiary cannot be attributed to the donating pharmaceutical manufacturer);

> (iii) The charity awards assistance without regard to the pharmaceutical manufacturer's interests and without regard to the beneficiary's choice of product, provider, practitioner, supplier, or Part D drug plan;

> (iv) The charity provides assistance based upon a reasonable, verifiable, and uniform measure of financial need that is applied in a consistent manner; and

> (v) The pharmaceutical manufacturer does not solicit or receive data from the charity that would facilitate the manufacturer in correlating the amount or frequency of its donations with the number of subsidized prescriptions for its products.

*Id.* at 70627; *see also* OIG Advisory Opinion 06-10, at 7-8 (HHS OIG Sept. 14, 2006) (setting forth analysis of factors), https://oig.hhs.gov/fraud/docs/advisoryopinions/2006/AdvOpn06-10A.pdf, as modified by OIG Notice of Modification of OIG Advisory Opinion No. 06-10 (Oct. 26, 2015), available at https://oig.hhs.gov/fraud/docs/advisoryopinions/2015/mod-advopn0610.pdf.

78.    With respect to (v), the 2005 SAB noted that, although it had previously allowed charities to provide aggregate data to manufacturers,

> [n]o individual patient information may be conveyed to donors. Moreover, neither patients nor donors may be informed of the donation made to the PAP by others. . . . Reporting of data that is not in the aggregate or that is patient specific would be problematic, as would reporting of any data, whether or not in the aggregate, related to the identity, amount, or nature of subsidized drugs.

70 F.R. at 70626 n.16.

79.    In addition, a footnote states that a manufacturer's in-kind donations to a charity (*i.e.*, free goods) are questionable because, *inter alia*, they "have the effect of creating a direct correlation between the donation and use of a particular donor's product, thereby weakening important safeguards of an independent Charity PAP arrangement." *Id.* at n.14.

80.    OIG Advisory Opinion No. 10-19, issued September 17, 2010, approved a charity's proposed receipt of cash and free goods, in part, because the donor pharmaceutical manufacturers would not be able to direct to whom their donations would be given nor learn how their donations were used:

> Donors would not be permitted to impose any restrictions on use of their contributions, except that donors would be permitted to earmark contributions to be used for a specific coagulation disorder. Donors would not be able to direct to whom such contributions should be awarded. Donors would not be told the specific use to which their contributions were or would be put, but they would have access to quarterly reports disclosing the recipients of awards granted by the Foundation.

Available at https://oig.hhs.gov/fraud/docs/advisoryopinions/2010/AdvOpn10-19.pdf.

81.     The OIG's guidance somewhat evolved in May 2014 when it issued a SAB entitled Supplemental Special Advisory Bulletin: Independent Charity Patient Assistance Programs, 79 F.R. 31120 (May. 30, 2014) (the "2014 SAB").  As the 2014 SAB explains, "We . . . noted in the 2005 SAB that we could only speculate on fraud and abuse risk areas, because the Part D benefit had not yet begun."  *Id.*  The 2014 SAB "provides additional guidance" and does not replace the 2005 SAB or the 2002 OIG Special Advisory Bulletin on Offering Gifts and Other Inducements to Beneficiaries.  *Id.*  It focusses on the growing trend of independent Charity PAPs establishing or operating specific disease funds that limit assistance to a subset of available products.  The OIG articulated a concern that such PAPs have a higher baseline risk of abuse when their assistance was limited to only a subset of available FDA-approved products for treatment of the disease.[9]

> Two remunerative aspects of PAP arrangements require scrutiny under the anti-kickback statute: donor contributions to PAPs (which can also be analyzed as indirect remuneration to patients) and PAPs' grants to patients. If a donation is made to a PAP to induce the PAP to recommend or arrange for the purchase of the donor's federally reimbursable items, the statute could be violated. Similarly, if a PAP's grant of financial assistance to a patient is made to influence the patient to purchase (or to induce the patient's physician to prescribe) certain items, the statute also could be violated.

*Id*. at 31121.

82.     The OIG reiterated that "pharmaceutical manufacturers and their affiliates should not exert any direct or indirect influence or control over the charity or its assistance program."  *Id.* The 2014 SAB advised Charity PAPs to define disease funds in accordance with widely recognized clinical standards and in a manner that covered a broad spectrum of products and manifestations of the disease (e.g., without reference to specific symptoms, drug stages, treatment types, severity of symptoms or other "narrowing" factors).  *Id*. at 31121-22.

---

[9] The 2005 SAB had voiced the same concerns about "narrowly" defined disease categories.  *See* 70 F.R. at 70627.

83. Finally, the 2014 SAB explained that

These opinions do not address actions by donors to correlate their funding of PAPs with support for their own products. Such actions may be indicative of a donor's intent to channel its financial support to copayments of its own products, which would implicate the anti-kickback statute.

*Id*. at 31123.

84. More recently, OIG has identified "problematic 'seeding' programs in which a manufacturer might offer a drug for free or at a greatly reduced cost to induce a patient onto that drug and for the patient to obtain subsequent supplies that would be billed to Federal health care programs." OIG Advisory Opinion No. 15-11, at 7 (HHS OIG Aug. 5, 2015) ("AO 15-11"), available at https://oig.hhs.gov/fraud/docs/advisoryopinions/2015/AdvOpn15-11.pdf.

85. OIG approved the program that was the subject of the advisory opinion only because 1) it provided no more than two 30-day supplies, and only to patients who had been waiting for insurance coverage decisions for at least five days; 2) the program was not actively marketed to patients; and 3) only 0.0008 % of shipments of the subject drug had been shipped pursuant to the program. *Id*.

86. All OIG guidance and prohibitions are predicated on the recognition that failure to collect co-pays from patients (whether by waiving it or paying the copay on behalf of the patient) "ultimately can *harm* both Federal health care programs and their beneficiaries" in part because "[w]hen consumers are relieved of copayment obligations, manufacturers are relieved of a market constraint on drug prices." 2014 SAB Copay Coupons, at 2. The AKS applies to failures to collect copays from patients, in part, because "[e]xcessive costs to Federal programs are among the harms that the anti-kickback statute is intended to prevent." Thus, limitations on copay waivers and payments of co-pays on behalf of patients are designed to (1) prevent systemic harm to Medicare and other drug coverage programs that drives the cost of drugs up; and (2) discourage prescription

and use of drugs where patient benefit is outweighed by costs and other concerns such as side effects and safety concerns.

## V. SPECIFIC ALLEGATIONS OF DEFENDANTS' FALSE CLAIMS

87.     Most of Biogen's drugs are used to treat patients with multiple sclerosis and hemophilia.  According to the company's internal documents, Biogen drugs were used to treat roughly 47.3% of the MS patients in the United States in June 2014; that market share was expected to pass 50% in 2015.  Biogen's drugs cost between $50,000 and $80,000 per year.  Just three of these drugs, Tecfidera, Avonex, and Tysabri, accounted for more than $8.4 billion in revenues in 2015.  This revenue included more than $1.1 billion in Medicare claims, $219 million in Medicaid claims, and millions more in other government-funded coverage claims.   The Biogen chart below shows that as of November 2013, Medicare, Medicaid, and other government-funded insurance comprised approximately 26.7% of Biogen's business.

| | Biogen Idec Payer Mix Nov 2013 | ACA Impact on Biogen Idec Payer Mix | | | |
| --- | --- | --- | --- | --- | --- |
| Payer | | 2014 | 2015 | 2016 | 2017 |
| Commercial (Employer & non-group) | 68.7% | 66.9% | 65.1% | 63.3% | 61.5% |
| Medicaid (Managed & FFS) | 4.3% | 4.8% | 5.3% | 5.5% | 5.6% |
| Medicare (part B and D) | 17.1% | 17.5% | 18.0% | 18.5% | 19.0% |
| Other Public (Veterans Administration, Department of Defense, Indian Health Service) | 5.3% | 5.3% | 5.3% | 5.3% | 5.3% |
| PAP (Uninsured free drug program) | 4.6% | 4.2% | 3.8% | 3.1% | 2.7% |
| Marketplace | 0.0% | 1.3% | 2.5% | 4.3% | 5.9% |
| TOTAL | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

Fewer Patients Needing Assistance, More Patients Insured Through Medicaid and Marketplaces

88.     As shown in this chart, the passage of the Affordable Care Act was expected to result in fewer patients needing Biogen's internal PAP or Free Drug Program as "more patients

[are] insured through Medicaid and Marketplaces." The percentage of Biogen's government business, however, was expected to climb to 29.9% of all its business by 2017.

89. As detailed below, Biogen repeatedly violated provisions of the AKS by (1) improperly "seeding" the use of its drugs through its Free Drug Program and (2) sweeping patients to Government Programs and donating money to Charity PAPs such as Defendants PANF, GD, and HF in exchange for the Charity PAPs' commitments to pay the copays of swept patients. According to Biogen's website, "[i]n 2014 alone, [Biogen] provided over $1 billion in patient financial assistance and free drug programs." Pricing Principles, available at https://www.biogen.com/en_us/about-biogen/positions-pricing.html#pricing-principles. Many of the resulting improperly induced prescriptions for Biogen products were paid for by Medicare, Medicaid and other government-funded health insurance programs in violation of the federal False Claims Act and several state false claims provisions.

### A. BIOGEN PAYS KICKBACKS IN THE FORM OF FREE GOODS TO INDUCE PATIENTS TO TAKE ITS DRUGS IN AN IMPROPER SEEDING PROGRAM

90. Each year Biogen provides free drugs to thousands of patients who have no insurance coverage, whether because they have no insurance or their insurance plan denies or limits coverage. Because the cost of goods sold for Biogen's drugs is only around 2%, the out-of-pocket cost to Biogen for this program is very low.

91. Biogen's Free Drug Program constitutes a large portion of the units that Biogen ships each year. For example, as shown in the below chart, contained in Biogen internal documents, in the third quarter of 2013, the Free Drug Program comprised 20.3% of the patients taking Tecfidera, 9.6% of patients taking Tysabri, and 11.7% of patients taking Avonex, far exceeding the 0.0008% of shipments that was approved as not "seeding" by the OIG in Advisory Opinion 15-11.



**TECFIDERA**

MS SHARE



**TYSABRI**

MS SHARE

28



92.    Nor did the Free Drug Program limit its provision of free goods to just two 30-day

supplies.  It provided as much as a year's worth of product and sometimes more.

93.    Also, contrary to the program approved by OIG in AO 15-11, Biogen advertises its

Free Drug Program and personalized patient assistance in obtaining coverage on its website:

> Biogen is dedicated to helping patients obtain access to our therapies.

> Our highly trained patient support representatives have access to a comprehensive suite of financial assistance tools to help patients and their caregivers and healthcare professionals understand, compare and select insurance options and programs that are available to them. Specifically, we have programs to assist people who are uninsured, privately insured and insured through public programs, such as Medicare.

> Financial assistance and insurance services for individuals who have been prescribed Biogen multiple sclerosis and hemophilia medications include:

> • Benefit investigation to help understand and determine the best coverage options for patients, including assistance with prior authorizations and denied claims;

- Insurance counseling for the uninsured and underinsured to help with obtaining adequate coverage, such as Medigap, COBRA and Medicaid;

- Support navigating the U.S. healthcare reform law (Affordable Care Act) to help patients take full advantage of new coverage opportunities;

- Enrolling eligible patients in the Biogen $0 copay program in which patients pay $0 a month for their drug costs;

- Helping patients find assistance through charitable organizations to cover items such as insurance premiums, copays and transportation needs; and

- Providing free medication to eligible patients in need.

94.    The primary purpose of the Free Drug Program is to "seed" Biogen's commercial (*i.e.*, paying) patient population.  Patients who cannot or will not pay for Biogen's drugs themselves are provided the drug for free, often resulting in prescription of the drug when it is of questionable therapeutic value.  Biogen does this because it knows that it is critically important to capture newly treated patients, regardless of whether they can pay; once a patient starts a particular therapy, he or she will likely continue on that therapy.  And Biogen's internal documents stress that as much as 70% of patients "will change their behavior based on the lack of copay assistance" or free drugs. When hemophilia drug Alprolix was being launched in early 2014, Biogen anticipated providing free drugs to as many as 51% of the patients that started therapy on it in order to capture as many patients as possible.

95.    Further, Biogen anticipates that a large portion of Biogen free-drug patients will eventually obtain coverage – *i.e.*, convert to being profitable commercial patients.  In fact, in conjunction with the Free Drug Program, Biogen – at first through Defendant McKesson a third party, and later in-house – performed thousands of "Benefits Investigations" or "BIs," to determine if and when Biogen free-drug patients could be converted to paying customers. A February 6, 2015 Biogen PowerPoint entitled "Tecfidera Brand Leadership Meeting" lauds Biogen's PS for completing more than 12,000 Benefit Investigations to determine coverage for Biogen free-drug

patients since the beginning of the year. [10]

96.    Biogen's intention to seed its commercial patient population with Biogen free-drug patients is particularly evident in Biogen's approach to Biogen free-drug patients who are or will become eligible for coverage from Government Programs.   In a November 2014 presentation "prepared for Biogen Idec" by third-party Avalere ("Avalere Presentation"), Biogen was informed that an estimated 32.7% of MS patients are covered by Medicare, another 10.7% by Medicaid, and another 3.7% by VA / Tricare and that "Medicare is expected to become the dominant payer for people with MS."   Additionally, CHAMPUS would cover 1.1% of hemophilia patients. *Id*. 33. As explained below, Biogen identifies the patients that are eligible and then affirmatively seeks their authorization to be enrolled in a Government Program.

97.    Thus, Biogen intentionally provides illegal remuneration in the form of free drugs to patients to induce them to take its drugs so that they will later submit claims for Biogen drugs to Government Programs for payment, an impermissible seeding program that violates the AKS.

### B. BIOGEN PAYS KICKBACKS IN THE FORM OF CO-PAYMENT ASSISTANCE TO INDUCE PATIENTS TO SUBMIT CLAIMS FOR BIOGEN DRUGS TO GOVERNMENT PROGRAMS FOR PAYMENT

98.    The scheme to "sweep" Biogen free-drug patients to Government Programs, often referred to by Biogen employees as a "Medicare Outreach sweep,"[11] works as follows:

99.    First, Biogen's Patient Services Department (or McKesson, both of which have administered the Biogen Free Drug Program) performs benefits investigations to identify which patients in the Free Drug Program are eligible for Medicare or other Government Programs.   Once

---

[10] An update to the PowerPoint explains that by March 4, PS had "[t]ransitioned Benefit Investigations and Prior Authorization Processing to a New vendor."

[11] As scrutiny of such conduct by OIG has increased, however, Biogen has begun referring to the process with oblique terms such as "free-to-commercial," "Conversions," "Transitions," "Commercial Optimization," "Access Initiative," and "Incremental Access Sweep."

identified, the patients are contacted to obtain their consent to being placed on the Government Program. Patients are informed that the change will cost them nothing.

100. Patient Services coordinates with the Defendant Charity PAPs to ensure there will be copay coverage for the Medicare-eligible patients. In a direct *quid pro quo*, Biogen obtains commitments from charities to cover specific patients' copays by awarding them grants. The commitments are directly based on the grant level Biogen awards. Within a day or two of when the grants are given to a charity, the agreed upon Biogen free-drug patients are swept to Medicare and enrolled in that charity's PAP to cover the patients' co-pays.

101. The Defendant Charity PAPs, whose programs are sometimes administered by third parties like Defendant The Lash Group, Inc.,[12] have certified that they are neither directed nor influenced by interests of any donors in determining which patients will be awarded grants to cover their copays.[13] Nevertheless, the amounts they receive in donations (more than 81% from pharmaceutical companies) have grown exponentially in less than a decade. For example, PANF reported total donations it received between 2005 and 2009 to be $215,460,416. Its reported donations in 2015, alone, were $801,155,793, and a total of $2,036,940,019 for 2011 to 2015.

102. Despite their certifications to the contrary, the Defendant Charity PAPs have agreed to direct as much as 90% of Biogen's donations to Biogen patients on Medicare or other Government Program.

103. The Charity PAPs also provide Biogen extremely detailed information in the form of dashboards and regular status reports pursuant to their contractual arrangements. The data provided allow Biogen to correlate its funding and actions to direct its support to patients taking

---

[12] *See, e.g.,* OIG Advisory Opinion 07-18, at 1 (OIG advisory opinion concerning Charity PAPs addressed to PANF and The Lash Group).

[13] *See, e.g.*, *id*. at 5.

its products.

104.    Biogen's Patient Services then coordinates with the SPP Defendants to ensure that patients have a smooth transition to the Government Programs.  US Bioservices ships an extra 60- to 90-day supply as the final shipment of free goods.  It then transfers the patients to a new SPP with the assistance of the SPP Defendants.  The other SPP Defendants, in turn, must expedite the processing of the new Government-Program patients.  Once the Defendant SPPs ship the first order to the new Government-Program patients, they submit a claim for reimbursement to the Government Programs, having previously certified that each claim would be filed in compliance with all healthcare laws and the Anti-Kickback Statute. *See, e.g.*,

105.    The timing of this process is critical to Biogen's yield from its charity donations. Because most PAPs operate on a first-come, first-served basis,[14] Biogen's patients must be enrolled within days of Biogen's donation in order to be captured by that donation. Without the facilitation of the SPP Defendants, the scheme does not work. The below slide (prepared by Relator for purposes of this litigation) provides a timeline of the sweep for Medicare Part D patients:[15]

---

[14] *See, e.g.*, OIG Advisory Opinion 07-18, at 4 (explaining that Defendant PANF "processes grant applications in order of receipt on a first-come, first-served basis, to the extent funding is available.").

[15] As explained further below, sweeps to Medicare Part D generally occurred in January, while sweeps to other Government Programs – such as Medicare Part B – occurred throughout the year.

| Table 1 | | | |
|---|---|---|---|
| Step | Process | Q4 | Q1 |
| 1 | PS: ID and quantify Medicare Part D Patients on PAP. | ◆ | |
| 2 | PS: communicate with finance regarding the number of potential patients to sweep, the expected yield (based on prior years) and cost. | ◆ | |
| 3 | Finance: communicates to PS regarding the amount they are will to fund and the timing. | ◆ | |
| 4 | PS: contacts patients for their authorization to move them to Part D coverage beginning in the new year being careful to explain this will not cost them money and their copay will be covered. | ◆ | |
| 5 | PS: based on step 3 PS has the targeted patients to participate in the Q1 sweep. | ◆ | |
| 6 | PS: communicates ships 3 months of therapy to patients (ensure enough safety stock so patient remains eligible if it takes longer than expected to sweep). | ◆ | |
| 7 | Finance: communicates to PS when grants were made, how much and to which charities. | | ◆ |
| 8 | PS: coordinates with charities for their commitment to fund patients copay. | | ◆ |
| 9 | PS: revenue generating shipments are made to patients previously on the PAP program. | | ◆ |

106.    The details of the grant figures and Government Program sweeps are transmitted by Patient Services to Biogen's Finance department, which provided the details of the expected revenue yield to Relator, as director of U.S. forecasting for all Biogen drugs, to incorporate into the revenue forecast.  Biogen's CEO George A. Scangos, CFO Paul Clancy, and Vice Presidents of Commercial Operations, Marketing, Sales, Patient Services, and U.S. Analytics were aware of and supported Biogen's Government Programs sweeps.

107.    Biogen tracked every prescription and knew precisely which Medicare and Medicaid prescriptions were covered by a Defendant Charity PAP.  One Biogen spreadsheet identifies primary and secondary payers for each prescription, including prescriptions paid for by Medicare that had a Defendant Charity PAP as the secondary payer.  The sources for this patient-specific data include the Charity PAP and SPP Defendants, as well as Biogen's Patient Services and, for Tysabri, Biogen's REMS program. A REMS program (or Risk Evaluation and Mitigation Strategy) is a series of protocols the FDA may impose on manufacturers of drugs or biologicals that pose enhanced safety risks. Among the protocols is the collection of patient-specific data.

108. For Biogen drugs that are reimbursed by Medicare Part D, these sweeps would begin at the end of the year. In late 2012, Relator asked Kimberley Urban, Associate Director of Access Strategy in the Patient Services department, why Medicare Part D patients had to be swept by the beginning of the year. Urban told him that regulations preclude a patient from being eligible for Medicare Part D in any calendar year in which they have received free goods.

109. In a November 20, 2013 Biogen email entitled "FW: Potential issues with shipment data," Steven Tyler, Senior Program Lead – Tecfidera, explains to Kimberly Urban and others that

> toward the end of the year, we do a large Medicare Outreach sweep. Historically, we have our PAP provider send a double shipment to provide PAP patients with enough free product to last through the end of Jan. As a result, you may notice a spike in TEC [Tecfidera] units in December.

A March 22, 2015 PowerPoint called "Tecfidera Patient Analysis" explains that 90-day supplies of free drugs were being sent to Medicare patients at the end of 2014: "US Bio[services] provided all Medicare (2718) patients with 90 days supply in end of 2014 so there would be no gap in therapy." *Id.* at 10.[16]

110. Thus, as shown below for Biogen drug Avonex, Biogen's Patient Services effectuated sweeps at the end of December 2013 and the end of December 2014. The dark blue bars, representing Medicare-eligible patients on Biogen's Free Drug Program, can be seen dropping significantly in January 2014 (2879 to 1007) and January 2015 (1288 to 311) for Biogen drug Avonex.

---

[16] In June 2014 Patient Services switched to sending 90-day supplies of free drugs to patients on the Free Drug Program. *See* BIIB USA August MS Performance and Insights, at 7.

**Free Drug Counts**



AVONEX

111.    Biogen swept more than 3300 patients taking Tecfidera to Government Programs at the end of 2014 and beginning of 2015.

112.    For Biogen's drug Tysabri, a physician-administered drug reimbursed by Medicare Part B and other Government Programs, the sweeps occurred more frequently during the year (resulting in more gradual declines of the Medicare-eligible patients on the Free Drug Program throughout the year), but there was an overall sweep of at least 1600 patients in 2013 and more than 500 patients in 2014. *Id.*



TYSABRI

113.    As explained in a series of emails from May 7, 2013 among Haley Tierney, Assistant Director Trade, Christopher Bostrom, Assistant Director of Finance, Michael Dovey, Assistant Director of Commercial Analytics, and Relator, a Medicare "sweep" (dubbed "Free to Commercial") occurred in April 2013, resulting in a drop of approximately 707 Tysabri patients

on the Free Drug Program.

| | November 2012 | December 2012 | January 2013 | February 2013 | March 2013 | April 2013 |
|---|---|---|---|---|---|---|
| **Tysabri Current Treated** *Includes Free (MS Only)* | | | | | | |
| **Total Regions** | 3,251 | 3,381 | 3,639 | 3,813 | 3,929 | 3,225 |
| **USA** | 3,171 | 3,298 | 3,563 | 3,734 | 3,851 | 3,144 |
| **Rest of World** | 80 | 83 | 76 | 79 | 78 | 81 |

114.    When the drop of 707 Free Drug Program patients in April 2013 is cross-referenced with the Tysabri chart above, it is clear that the drop is based largely on a drop in Medicare-eligible Free Drug Program patients in that time period, which dropped by 660 patients.  The only other group that lost Free Drug Program patients during that period was the "partial coverage" insured group, which lost two Free Drug Program patients.

115.    The below chart, derived from Biogen data, shows a sweep of 186 Tysabri patients that occurred in June 2012, with weekly sweeps forecast to begin August 2012.



116. Upon information and belief, the Medicare Outreach sweeps began as early as September 15, 2006, and no later than January 2009, long before the above June 2012 sweep.

117. In December 2013, Biogen became concerned about detection of its sweep program following news of a federal investigation into the relationship between pharmaceutical company Questcor and Defendant GD (when it was known as the Chronic Disease Fund). At the beginning of 2014, Relator's supervisor Joe Mara, the Senior Director of Commercial Finance and direct report to Biogen CFO Paul Clancy, told Relator to stop using the term "sweep" in presentation decks or conversations, and instead to use the term "patient mix," referring to the ratio between patients on the free drug program and those whose insurance pay for the drugs. There was no change in Biogen conduct. On the contrary, Biogen stopped using McKesson around this time and shifted its functions back to its internal Patient Services group because it did not feel McKesson was sweeping over enough patients. The change in terminology was motivated purely out of

concerns over being caught perpetuating illegal activity.

118. At a subsequent meeting that included Clancy, Mara, Relator, and other Biogen colleagues Susan Altschuller and Tarush Somani, Clancy rebuked Altschuller for using the term "sweep" in discussing 2015 forecasts, stating, "We don't sweep patients." Altschuller responded that she meant the patient mix would become more favorable. It was about this time that Patient Services stopped posting dashboards that provided tracking updates on free patients and the patient mix.

119. The sweeps nonetheless continued throughout Relator's employ. Indeed, the day after the meeting with Altschuller, Mara informed Relator and Somani that Paul Clancy wanted to increase the forecasted number of patients that would be swept to Government Programs in 2015. In July 2014 Patient Services engaged in "heavy [] conversion efforts" for Tecfidera. At the end of 2014, Biogen anticipated sweeping 2718 Medicare patients taking Tecfidera and US Bioservices "provided [them] all [] with 90 days supply . . . so there would be no gap in therapy when" they are swept. Similarly, a 2015 Biogen PowerPoint explains that a key recent accomplishment of Patient Services is "**FDP [Free Drug Program] Sweeps**: Targeting 1606 Tec Transitions through annual Medicare Outreach and ACA Outreach."

120. In addition, in late 2014, with the implementation of the Affordable Care Act and expansion of Medicaid coverage, Biogen determined that some 25 million uninsured patients would seek coverage each year, including a total of about 41.3 million obtaining Medicaid coverage. In response, Biogen's Patient Services "launch[ed] Medicaid sweeps and now premium assistance" because "[w]e want to get people insured." The plan was that, "[a]ssuming that 50% of PAP is transferred to Medicaid due to Medicaid expansions, Patient Services will proactively sweep PAP to move patients out of program if suitable coverage exists."

121.    The people held primarily accountable for these sweeps were Kimberly Urban, Associate Director of Access Strategy, and Mike Krzan, Vice President of Patient Services.  They coordinated directly with charities through emails or calls or through Defendants ACS and McKesson, which acted as bridges between Biogen and the Defendant Charity PAPs.  Upper management pressured Krzan to push successful sweeps onto Government Programs. This was particularly so after the Q1 2014 sweep of Tecfidera patients.  The sweep numbers were much lower than expected because US Bioservices had shipped new orders of free drugs in January of 2014 to patients that were to be swept to Medicare Part D, precluding sweeping those patients.  Thus, as the chart below shows, the number of Medicare-eligible free-drug patients taking Tecfidera actually increased by 1,189 patients in January 2014.[17]



122.    The success of sweeps, in turn, had a direct impact on Biogen's revenues and, for that reason Biogen tracked its success regularly to confirm whether its kickback schemes were working.  For example, one 2012 analysis explained that there was a $4.5 million upside in revenue for Avonex due in part to "[i]mproved execution on Access program," which swept 500 patients more than had been forecast.

---

[17] By contrast, as discussed above, the number of Medicare-eligible free drug patients dropped in January 2014 for Avonex and Tysabri.

123.     Because the success of its schemes required Biogen to ensure that the charities were sufficiently funded, Biogen also kept a watchful eye on its reserves.  Specifically, Biogen tracked its "potential coverage gap exposure for Part D patients," *i.e.*, the donut-hole coverage kickbacks Biogen provided Medicare patients. Biogen maintained a "coverage gap reserve."  As shown below, in a breakdown of discounts and adjustments ("D&A"), for 2015, Biogen budgeted a coverage gap reserve for four drugs to be $44.1 million, in addition to $111.9 million in co-pay assistance.  In particular, for Biogen drug Avonex, Medicare was expected to represent 24% of payers, and the coverage gap reserve was $14.4 million.



## Avonex

**Payer mix of business**

| Total D&A | % | $M |
|---|---|---|
| PHS | 1.2% | 18.8 |
| Fed Chargebacks | 3.1% | 46.6 |
| Fed Rebates (Tricare) | 0.3% | 5.2 |
| Commercial | 3.7% | 55.6 |
| Medicare part D | 1.4% | 21.6 |
| Medicaid | 5.7% | 86.2 |
| **Total Payers** | **15.5%** | **234.0** |
| Trade | 0.0% | - |
| Prompt Pay | 2.0% | 30.2 |
| Volume | 0.0% | - |
| DMA | 1.8% | 27.0 |
| Returns | 1.4% | 20.7 |
| SPPs | 0.5% | 7.3 |
| Copay Assistance | 1.4% | 21.7 |
| Coverage Gap | 1.0% | 14.4 |
| **Total Channel / Pts** | **8.0%** | **121.3** |
| **Total** | **23.5%** | **355.3** |

**Payer rate by segment**

## Plegridy

**Payer mix of business**

| Total D&A | % | $M |
|---|---|---|
| PHS | 0.1% | 1.0 |
| Fed Chargebacks | 1.1% | 9.5 |
| Fed Rebates (Tricare) | 0.0% | 0.4 |
| Commercial | 3.2% | 27.6 |
| Medicare part D | 0.1% | 1.1 |
| Medicaid | 0.5% | 4.5 |
| **Total Payers** | **5.2%** | **44.1** |
| Prompt Pay | 2.0% | 17.0 |
| Volume | 0.0% | - |
| DMA | 1.8% | 15.4 |
| Returns | 0.6% | 5.5 |
| SPPs | 1.4% | 12.2 |
| Copay Assistance | 2.2% | 18.3 |
| Coverage Gap | 0.5% | 4.5 |
| **Total Channel / Pts** | **8.6%** | **73.0** |
| **Total** | **13.8%** | **117.1** |

**Payer rate by segment**



124.    Biogen anticipated that with the implementation of the ACA and expansion of Medicaid coverage, more patients on Medicare Part D would transition to Medicaid, which would

43

decrease its Part D coverage gap exposure. At the same time, it was expected that fewer Medicare enrollees would have employer drug coverage, which would increase Biogen's Part D coverage gap exposure.

### C. TECFIDERA SAFETY ISSUE AND LAGGING SALES PROMPT BIOGEN TO CONTINUE ITS SIZEABLE CHARITY PROGRAM IN 2015, DESPITE CONCERNS OVER OIG AND WALL STREET SCRUTINY

125.    In October 2014, Biogen announced that a patient taking Tecfidera was diagnosed with progressive multifocal leukoencephalopathy ("PML") and later died.  PML is caused by the JCV virus, a very serious, aggressive and rare viral infection of the brain. There are no targeted therapies for PML.

126.    Biogen was very concerned about the reaction from patients and physicians to the Tecfidera safety news.  Years earlier, in 2005, Biogen's drug Tysabri was removed from the market because of PML cases. After being removed from the market for more than a year, Biogen succeeded in having Tysabri reintroduced to the market under a strict FDA-mandated REMS program.  But the new (worse) safety profile of Tysabri changed the outlook for the drug from a $4-6 billion juggernaut to a $1-2 billion brand.

127.    Given this history, there was concern that PML was causing slowing demand for Tecfidera.  Prescriptions in November and December of 2014 for Tecfidera were flat and new patient starts were declining.  Senior management at Biogen was very concerned about showing slowing Tecfidera sales following the PML case because they thought it would lead Wall Street to conclude that PML was slowing Tecfidera demand. Such a narrative would be picked up by the press and would prolong the negative safety story about Tecfidera, becoming a self-fulfilling prophecy. Competitors Novartis and Teva were very aggressive about letting doctors know about the PML case.

128.    At the end of 2014, to conceal the slowing Tecfidera demand, the finance

department coordinated with the Biogen trade group to have McKesson, a drug wholesaler, purchase another two weeks of Tecfidera inventory more than they would normally buy. But the cover would be short-lived, as McKesson would buy less Tecfidera in Q1 of 2015 than it normally would.

129.     A large Tecfidera sweep was seen as the way to demonstrate that Tecfidera demand was still strong and to plug revenue holes caused by patients discontinuing therapy because of the PML safety event. Wall Street was unaware of the roughly 9,000 Tecfidera patients receiving free drugs. Sweeping some of the Medicare Part D free-drug patients over to Medicare (a commercial payer) would make it appear as if new patients had started therapy. The IMS Health Rx audit that Wall Street buys does not include free-drug prescriptions. Patient sweeps, therefore, look like an uptick in new demand, rather than a change in patient status.

130.     In early 2015, Joe Mara told Relator that the CFO and Biogen's legal department were getting concerned about the level of sweeps planned for Q1 because of increased OIG scrutiny. Mara asked Relator what the impact of not doing the sweeps would be for 2015 revenue and whether the shortfall could be covered with a Direct-to-Consumer ("DTC") television campaign. Relator told Mara failure to do the sweeps would impact the quarter by ~$30 million and over $100 million for the year. Further, the quarter was already looking very bad because of weak Tecfidera patient demand and the extra inventory in the channel from the sale to McKesson in late 2014.

131.     Relator was asked by Mara to prepare a ROI analysis of charity donations for Q4 2014. Tecfidera Charity ROI Calculation. Mara wanted to use the ROI to justify continuing the larger commitments to charity that would be required to sweep so many patients. The ROI, see below, shows that the company anticipated their Charity PAP "yield" to be 90%, meaning 90% of

Biogen's contribution to the Charity PAP would be directed to patients taking Biogen products. *Id*. The expected ROI was $18 for every dollar granted to the charity. *Id*.

| Row | Per Patient Per Year (PPPY) | Tec | Calculation |
|-----|------------------------------|--------|-------------|
| a | Gross Price | 60,000 | |
| b | Gross to Net | 18% | |
| c | Net Price | 49,200 | a*(1-b) |
| d | Compliance | 88% | |
| e | Persistence | 75% | |
| f | Expected Patient Revenue | 32,472 | c*d*e |
| g | COGS | 2% | |
| h | Gross Profit | 31,823 | f*(1-g) |
| | | | |
| i | Monthly Copay | 200 | |
| j | Expected Month of Therapy | 7.9 | d*e*12 |
| k | Charity Yield | 90% | |
| l | Cost PPPY | 1,760 | (i*j)/k |
| | | | |
| m | Expected ROI | 18 | h/l |

Tecfidera Charity ROI Calculation

132.     By contrast, as Relator explained to Mara, the ROI assumption for the DTC campaign was 3:1 (*i.e.* for every $1 spend Biogen could expect $3 in incremental revenue) over a 36-month period. That would not cover the expected shortfall from the slowing demand from the safety event. The decision by the CFO and other senior management personnel was to fund the Tecfidera sweeps. As noted above, more than 3300 free-drug patients were swept to Medicare by Q1 2015. Free Drug Counts (Tecfidera is named "DMF" in chart).

133.     Unlike the donor and PAP arrangements that have been approved by OIG, Biogen did exert influence and control over the Charity PAPs it contributed to by coordinating with them to ensure that 90% of the funds Biogen donated were used to provide co-pay or other assistance to

Biogen patients. Moreover, through its coordination with Charity PAPs, Biogen obtained data that "facilitate[d] [Biogen] in correlating the amount or frequency of its donations with the amount or frequency of the use of its drugs or services." 70 F.R. at 70627. And it did so with the "intent to induce or reward referrals of Federal health care program business," in violation of the AKS, the False Claims Act and the State False Claims Acts.

134. The 2003 OIG Guidance discussed above identified several questions that should be asked to determine if a practice violates the AKS, including:

- Does the arrangement or practice have a potential to interfere with, or skew, clinical decision-making?

- Does the arrangement or practice have a potential to increase costs to the federal health care programs, beneficiaries, or enrollees?

- Does the arrangement or practice have a potential to increase the risk of overutilization or inappropriate utilization?

- Does the arrangement or practice raise patient safety or quality of care concerns?

68 FR at 27374. The answer to each of these questions with respect to Biogen's provision of free drugs and "sweeps" of Free Drug Program participants to Government Programs is a resounding "Yes."

135. Defendants' violations of the AKS, in turn, caused the submission of false claims to the Government Programs seeking payment for prescriptions of Biogen products tainted by the kickbacks.

## VI.     COUNTS

### COUNT ONE
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)[18]
### Against All Defendants

136.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

137.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

138.     By virtue of the free good and co-payment kickbacks described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment to federal health care programs.

139.     The United States, unaware of the AKS violations or the false or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

140.     By reason of these payments, the United States has been damaged and continues to be damaged, in a substantial amount.

### COUNT TWO
### Federal False Claims Act, 31 U.S.C. § 3729 (a)(1)(C)[19]
### Against All Defendants

141.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

142.     This is a claim for treble damages and civil penalties under the False Claims Act,

---

[18] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.* 31 U.S.C. § 3729(a)(1) (2006).

[19] To the extent wrongdoing occurred prior to May 20, 2009, this Amended Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, e.g. 31 U.S.C. § 3729(a)(3).

31 U.S.C. § 3729(a)(1)(C).

143.    In creating and implementing the kickback scheme described above, Defendants conspired to commit violations of 31 U.S.C. § 3729(a)(1)(A).

144.    The United States, unaware of the false or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

145.    By reason of these payments, the United States has been damaged and continues to be damaged in a substantial amount.

### COUNT THREE
### Massachusetts False Claims Act, Mass. Ann. Laws ch. 12, § 5B *et seq*.
### Against All Defendants

146.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

147.    This is a claim for treble damages and civil penalties under the Massachusetts False Claims Act, Mass. Ann. Laws Ch. 12, § 5B-O, filed pursuant to Mass. Ann. Laws ch. 12, § 5C(2).

148.    By virtue of the free good and co-payment kickbacks described above, Defendants knowingly presented or caused to be presented to the Massachusetts Medicaid Program false or fraudulent claims for payment or approval.

149.    Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Massachusetts False Claims Act.

150.    The Massachusetts Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

151.    By reason of these payments, the Massachusetts Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT FOUR
### California False Claims Act, Cal. Gov't Code § 12651 *et seq*.
### Against All Defendants

152. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

153. This is a claim for treble damages and civil penalties under the California False Claims Act, Cal. Gov't Code § 12651 *et seq*., filed pursuant to Cal. Gov. Code § 12652(c)(1).

154. By virtue of the free good and co-payment kickbacks described above, Defendants knowingly presented or caused to be presented to the California Medicaid Program (*i.e.*, Medi-Cal) false or fraudulent claims for payment or approval.

155. Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the California False Claims Act.

156. The California Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

157. By reason of these payments, the California Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT FIVE
### Colorado Medicaid False Claims Act, Colo. Rev. Stat. §§ 25.5-4-303.5, *et seq*.
### Against All Defendants

158. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

159. This is a claim for treble damages and civil penalties under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. §§ 25.5-4-303.5, *et seq*., filed pursuant to Colo. Rev. Stat. § 25.5-4-306(2).

160. By virtue of the free good and co-payment kickbacks described above, Defendants

knowingly presented or caused to be presented to the Colorado Medicaid Program false or fraudulent claims for payment or approval.

161.    Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Colorado Medicaid False Claims Act.

162.    The Colorado Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

163.    By reason of these payments, the Colorado Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT SIX
### Delaware False Claims and Reporting Act, 6 Del. C. § 1201 *et seq*.
### Against All Defendants

164.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

165.    This is a claim for treble damages and civil penalties under the Delaware False Claims and Reporting Act, 6 Del. C. § 1201 *et seq*., filed pursuant to 6 Del. C. § 1203(b)(1).

166.    By virtue of the free good and co-payment kickbacks described above, Defendants knowingly presented or caused to be presented to the Delaware Medicaid program false or fraudulent claims for payment or approval.

167.    Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Delaware False Claims and Reporting Act.

168.    The Delaware Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

169.    By reason of these payments, the Delaware Medicaid Program has been damaged and continues to be damaged in a substantial amount.

**COUNT SEVEN**
**Florida False Claims Act, Fla. Stat. Ann. § 68.081** *et seq.*
**Against All Defendants**

170.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

171.     This is a claim for treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. Ann. § 68.081 *et seq.*, filed pursuant to Fla. Stat. Ann. § 68.083(2).

172.     By virtue of the free good and co-payment kickbacks described above, Defendants knowingly presented or caused to be presented to the Florida Medicaid Program false or fraudulent claims for payment or approval.

173.     Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Florida False Claims Act.

174.     The Florida Medicaid Program, unaware of the false or fraudulent nature of the 244.claims caused by Defendants, paid for claims that otherwise would not have been allowed.

175.     By reason of these payments, the Florida Medicaid Program has been damaged and continues to be damaged in a substantial amount.

**COUNT EIGHT**
**Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168** *et seq.*
**Against All Defendants**

176.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

177.     This is a claim for treble damages and civil penalties under the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq.*, filed pursuant to Ga. Code Ann. § 49-4-168.2(b).

178.     By virtue of the free good and co-payment kickbacks described above, Defendants

knowingly presented or caused to be presented to the Georgia Medicaid Program false or fraudulent claims for payment or approval.

179.     Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Georgia False Medicaid Claims Act.

180.     The Georgia Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

181.     By reason of these payments, the Georgia Medicaid Program has been damaged and continues to be damaged in a substantial amount.

**COUNT NINE**
**Hawaii False Claims Act, Haw. Rev. Stat. § 661-21** *et seq.*
**Against All Defendants**

182.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

183.     This is a claim for treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*, filed pursuant to Haw. Rev. Stat. § 661-25.

184.     By virtue of the free good and co-payment kickbacks described above, Defendants knowingly presented or caused to be presented to the Hawaii Medicaid Program false or fraudulent claims for payment or approval.

185.     Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Hawaii False Claims Act.

186.     The Hawaii Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

187.     By reason of these payments, the Hawaii Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT TEN
### Illinois False Claims Act, 740 ILCS 175/1 *et seq.*
### Against All Defendants

188. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

189. This is a claim for treble damages and civil penalties under the Illinois False Claims Act, 740 ILCS 175/1 *et seq.*, filed pursuant to 740 ILCS 175/4(b)(1).

190. By virtue of the free good and co-payment kickbacks described above, Defendants knowingly presented or caused to be presented to the Illinois Medicaid Program false or fraudulent claims for payment or approval.

191. Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Illinois False Claims Act.

192. The Illinois Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

193. By reason of these payments, the Illinois Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT ELEVEN
### Indiana False Claims and Whistleblower Protection Act,
### Burns Ind. Code Ann. § 5-11-5.5-1 *et seq.*
### Against All Defendants

194. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

195. This is a claim for treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Burns Ind. Code Ann. § 5-11-5.5-1 *et seq.*, filed pursuant to Burns Ind. Code Ann. § 5-11-5.5-4(a).

196. By virtue of the free good and co-payment kickbacks described above, Defendants

knowingly presented or caused to be presented to the Indiana Medicaid Program false or fraudulent claims for payment or approval.

197.    Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Indiana False Claims and Whistleblower Protection Act.

198.    The Indiana Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

199.    By reason of these payments, the Indiana Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT TWELVE
## Iowa False Claims Act, Iowa Code 685 *et seq*.,

200.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

201.    This is a claim for treble damages and civil penalties under the Iowa False Claims Act, Iowa Code 685, *et seq.*, filed pursuant to Iowa Code § 685.3.2.a.

202.    By virtue of the free good and co-payment kickbacks described above, Defendants knowingly presented or caused to be presented to the Iowa Medicaid Program false or fraudulent claims for payment or approval.

203.    Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Iowa False Claims Act.

204.    The Iowa Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

205.    By reason of these payments, the Iowa Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT THIRTEEN
### Louisiana Medical Assistance Programs Integrity Law,
### La. Rev. Stat. Ann. § 46:437.1 *et seq.*
### Against All Defendants

206.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

207.    This is a claim for treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:437.1 *et seq.*, filed pursuant to La. Rev. Stat. Ann. § 46:439.1.

208.    By virtue of the free good and co-payment kickbacks described above, Defendants knowingly presented or caused to be presented to the Louisiana Medicaid Program false or fraudulent claims for payment or approval.

209.    Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Louisiana Medical Assistance Programs Integrity Law.

210.    The Louisiana Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

211.    By reason of these payments, the Louisiana Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT FOURTEEN
### Maryland False Claims Act, Md. Code Ann., Health–Gen. § 2-601 *et seq.*
### Against All Defendants

212.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

213.    This is a claim for treble damages and civil penalties under the Maryland False Claims Act, Md. Code Ann., Health–Gen. § 2-601 *et seq.*, filed pursuant to Md. Code Ann.,

Health–Gen. § 2-603.

214.     By virtue of the free good and co-payment kickbacks described above, Defendants knowingly presented or caused to be presented to the Maryland Medicaid Program false or fraudulent claims for payment or approval.

215.     Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Maryland False Claims Act.

216.     The Maryland Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

217.     By reason of these payments, the Maryland Medicaid Program has been damaged and continues to be damaged in a substantial amount.

**COUNT FIFTEEN**
**Michigan Medicaid False Claims Act, Mich. Comp. Laws Serv. § 400.601 *et seq*.**
**Against All Defendants**

218.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

219.     This is a claim for treble damages and civil penalties under the Michigan Medicaid False Claims Act, Mich. Comp. Laws Serv. § 400.601 *et seq*., filed pursuant to Mich. Comp. Laws Serv. § 400.610a(1).

220.     By virtue of the free good and co-payment kickbacks described above, Defendants knowingly presented or caused to be presented to the Michigan Medicaid Program false or fraudulent claims for payment or approval.

221.     Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Michigan Medicaid False Claims Act.

222.     The Michigan Medicaid Program, unaware of the false or fraudulent nature of the

claims caused by Defendants, paid for claims that otherwise would not have been allowed.

223.    By reason of these payments, the Michigan Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT SIXTEEN
### Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq.*
### Against All Defendants

224.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

225.    This is a claim for treble damages and civil penalties under the Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq.*, filed pursuant to Minn. Stat. § 15C.05(a).

226.    By virtue of the free good and co-payment kickbacks described above, Defendants knowingly presented or caused to be presented to the Minnesota Medicaid Program false or fraudulent claims for payment or approval.

227.    Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Minnesota False Claims Act.

228.    The Minnesota Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

229.    By reason of these payments, the Minnesota Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT SEVENTEEN
### Montana False Claims Act; Mont. Code Anno. § 17-8-401 *et seq.*
### Against All Defendants

230.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

231.    This is a claim for treble damages and civil penalties under the Montana False

Claims Act; Mont. Code Anno. § 17-8-401 *et seq.*, filed pursuant to Mont. Code Anno. § 17-8-401(1).

232.    By virtue of the free good and co-payment kickbacks described above, Defendants knowingly presented or caused to be presented to the Montana Medicaid Program false or fraudulent claims for payment or approval.

233.    Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Montana False Claims Act.

234.    The Montana Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

235.    By reason of these payments, the Montana Medicaid Program has been damaged and continues to be damaged in a substantial amount.

**COUNT EIGHTEEN**
**Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 *et seq.***
**Against All Defendants**

236.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

237.    This is a claim for treble damages and civil penalties under the Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 *et seq.*, filed pursuant to Nev. Rev. Stat. Ann. § 357.080.1.

238.    By virtue of the free good and co-payment kickbacks described above, Defendants knowingly presented or caused to be presented to the Nevada Medicaid Program false or fraudulent claims for payment or approval.

239.    Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Nevada False Claims Act.

240.    The Nevada Medicaid Program, unaware of the false or fraudulent nature of the

claims caused by Defendants, paid for claims that otherwise would not have been allowed.

241.    By reason of these payments, the Nevada Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT NINETEEN
### New Jersey False Claims Act; N.J. Stat. § 2A:32C-1 *et seq.*
### Against All Defendants

242.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

243.    This is a claim for treble damages and civil penalties under the New Jersey False Claims Act; N.J. Stat. § 2A:32C-1 *et seq.*, filed pursuant to N.J. Stat. § 2A:32C-5.

244.    By virtue of the free good and co-payment kickbacks described above, Defendants knowingly presented or caused to be presented to the New Jersey Medicaid Program false or fraudulent claims for payment or approval.

245.    Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the New Jersey False Claims Act.

246.    The New Jersey Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

247.    By reason of these payments, the New Jersey Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT TWENTY
### New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.*
### Against All Defendants

248.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

249.    This is a claim for treble damages and civil penalties under the New Mexico

Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq*., filed pursuant to N.M. Stat. Ann. § 27-14-7.B.

250.    By virtue of the free good and co-payment kickbacks described above, Defendants knowingly presented or caused to be presented to the New Mexico Medicaid Program false or fraudulent claims for payment or approval.

251.    Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the New Mexico Medicaid False Claims Act.

252.    The New Mexico Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

253.    By reason of these payments, the New Mexico Medicaid Program has been damaged and continues to be damaged in a substantial amount.

**COUNT TWENTY-ONE**
**New York False Claims Act, N.Y. State Fin. Law § 187 *et seq*.**
**Against All Defendants**

254.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

255.    This is a claim for treble damages and civil penalties under the New York False Claims Act, N.Y. State Fin. Law § 187 *et seq*., filed pursuant to N.Y. State Fin. Law § 187.2(a)

256.    By virtue of the free good and co-payment kickbacks described above, Defendants knowingly presented or caused to be presented to the New York Medicaid Program false or fraudulent claims for payment or approval.

257.    Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the New York False Claims Act.

258.    The New York Medicaid Program, unaware of the false or fraudulent nature of the

claims caused by Defendants, paid for claims that otherwise would not have been allowed.

259. By reason of these payments, the New York Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT TWENTY-TWO
### North Carolina False Claims Act, N.C.G.S. § 1-605 *et seq*.
### Against All Defendants

260. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

261. This is a claim for treble damages and civil penalties under the North Carolina False Claims Act, N.C.G.S. § 1-605 *et seq*., filed pursuant to N.C. Gen. Stat. § 1-608(b).

262. By virtue of the free good and co-payment kickbacks described above, Defendants knowingly presented or caused to be presented to the North Carolina Medicaid Program false or fraudulent claims for payment or approval.

263. Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the North Carolina False Claims Act.

264. The North Carolina Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

265. By reason of these payments, the North Carolina Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT TWENTY -THREE
### Oklahoma Medicaid False Claims Act, 63 Okl. St. § 5053 *et seq*.
### Against All Defendants

266. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

267. This is a claim for treble damages and civil penalties under the Oklahoma Medicaid

False Claims Act, 63 Okl. St. § 5053 *et seq.*, filed pursuant to 63 Okl. St. § 5053.2.B.1.

268.     By virtue of the free good and co-payment kickbacks described above, Defendants knowingly presented or caused to be presented to the Oklahoma Medicaid Program false or fraudulent claims for payment or approval.

269.     Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Oklahoma Medicaid False Claims Act.

270.     The Oklahoma Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

271.     By reason of these payments, the Oklahoma Medicaid Program has been damaged and continues to be damaged in a substantial amount.

**COUNT TWENTY-FOUR**
**Rhode Island False Claims Act; R.I. Gen. Laws § 9-1.1-1 *et seq*.**
**Against All Defendants**

272.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

273.     This is a claim for treble damages and civil penalties under the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.*, filed pursuant to R.I. Gen. Laws § 9-1.1-4(b)(1).

274.     By virtue of the free good and co-payment kickbacks described above, Defendants knowingly presented or caused to be presented to the Rhode Island Medicaid Program false or fraudulent claims for payment or approval.

275.     Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Rhode Island False Claims Act.

276.     The Rhode Island Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

277. By reason of these payments, the Rhode Island Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT TWENTY-FIVE
### Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq*.
### Against All Defendants

278. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

279. This is a claim for treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq*., filed pursuant to Tenn. Code Ann. § 71-5-183(b)(1).

280. By virtue of the free good and co-payment kickbacks described above, Defendants knowingly presented or caused to be presented to the Tennessee Medicaid Program false or fraudulent claims for payment or approval.

281. Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Tennessee Medicaid False Claims Act.

282. The Tennessee Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

283. By reason of these payments, the Tennessee Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT TWENTY-SIX
### Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq*.
### Against All Defendants

284. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

285. This is a claim for treble damages and civil penalties under the Texas Medicaid

Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq.*, filed pursuant to Tex. Hum. Res. Code § 36.101(a).

286.    By virtue of the free good and co-payment kickbacks described above, Defendants knowingly presented or caused to be presented to the Texas Medicaid Program false or fraudulent claims for payment or approval.

287.    Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Texas Medicaid Fraud Prevention Act.

288.    The Texas Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

289.    By reason of these payments, the Texas Medicaid Program has been damaged and continues to be damaged in a substantial amount.

**COUNT TWENTY-SEVEN**
**Vermont False Claims Act, 32 V.S.A. § 632 *et seq.***
**Against All Defendants**

290.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

291.    This is a claim for treble damages and civil penalties under the Vermont False Claims Act, 32 V.S.A. § 632 et seq. filed pursuant to 32 V.S.A. § 632(b)(2).

292.    By virtue of the free good and co-payment kickbacks described above, Defendants knowingly presented or caused to be presented to the Vermont Medicaid Program false or fraudulent claims for payment or approval.

293.    The Vermont Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

294.    By reason of these payments, the Vermont Medicaid Program has been damaged

and continues to be damaged in a substantial amount.

## COUNT TWENTY-EIGHT
### Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.*
### Against All Defendants

295. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

296. This is a claim for treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.*, filed pursuant to Va. Code Ann. § 8.01-216.5.

297. By virtue of the free good and co-payment kickbacks described above, Defendants knowingly presented or caused to be presented to the Virginia Medicaid Program false or fraudulent claims for payment or approval.

298. The Virginia Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

299. By reason of these payments, the Virginia Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT TWENTY-NINE
### Washington Medicaid Fraud False Claims Act, Rev. Code Wash. § 74.66 *et seq.*
### Against All Defendants

300. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

301. This is a claim for treble damages and civil penalties under the Washington Medicaid Fraud False Claims Act, Rev. Code Wash. § 74.66 *et seq.*, filed pursuant to Rev. Code Wash. § 74.66.050(1).

302. By virtue of the free good and co-payment kickbacks described above, Defendants

knowingly presented or caused to be presented to the Washington Medicaid Program false or fraudulent claims for payment or approval.

303.    Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Washington Medicaid Fraud False Claims Act.

304.    The Washington Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

305.    By reason of these payments, the Washington Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT THIRTY
### District of Columbia False Claims Act, D.C. Code § 2-381.01 *et seq*.
### Against All Defendants

306.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

307.    This is a claim for treble damages and civil penalties under the District of Columbia False Claims Act, D.C. Code § 2-381.01 *et seq*., filed pursuant to D.C. Code § 2-381.03(b)(1).

308.    By virtue of the free good and co-payment kickbacks described above, Defendants knowingly presented or caused to be presented to the District of Columbia Medicaid Program false or fraudulent claims for payment or approval.

309.    Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the District of Columbia False Claims Act.

310.    The District of Columbia Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

311.    By reason of these payments, the District of Columbia Medicaid Program has been

damaged and continues to be damaged in a substantial amount.

## VII.  PRAYER FOR RELIEF

**WHEREFORE**, Relator requests that judgment be entered against Defendants, ordering that:

a.     Defendants cease and desist from violating the Anti-Kickback Statute, 42 U.S.C. the False Claims Act, 31 U.S.C. § 3729 *et seq*., and the State False Claims Acts;

b.     Defendants pay not less than $5,500 and not more than $11,000[20] for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of Defendants' actions, plus the appropriate amount under each of the State False Claims Acts;

c.     The Relator be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d) and similar provisions of the State False Claims Acts;

d.     The Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d) and similar provisions of the State False Claims Acts;

e.     Defendants be enjoined from concealing, removing, encumbering or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

f.     Defendants disgorge all sums by which they have been enriched unjustly by their wrongful conduct; and

g.     The United States, the State Plaintiffs, and the Relator recover such other relief as the Court deems just and proper.

---

[20] For Biogen conduct that occurred after November 1, 2015, Defendants pay not less than $10,781.40 and not more than $21,562.80 for each violation of 31 U.S.C. § 3729 *et seq*. 82 FR 9131

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Relator hereby demands a trial by a jury.

Dated: March 21, 2017

Respectfully submitted,

**FICK & MARX LLP**

William W. Fick, BBO # 650562
wfick@fickmarx.com
Daniel N. Marx, BBO # 674523
dmarx@fickmarx.com
Nancy Gertner, BBO # 190140
ngertner@fickmarx.com
100 Franklin Street, 7th Floor
Boston, MA  02110
Tel:  857-321-8360
Fax:  857-321-8361

**GUTTMAN, BUSCHNER & BROOKS PLLC**
Reuben A. Guttman*
rguttman@gbblegal.com
Traci L. Buschner *
tbuschner@gbblegal.com
Elizabeth H. Shofner*
lshofner@gbblegal.com
2000 P Street, N.W., Suite 300
Washington, DC 20036
Tel: 202-800-3000
Fax: 202-827-0041

Justin S. Brooks*
jbrooks@gbblegal.com
1701 Walnut Street
7th Floor
Philadelphia, PA 19103
Tel: 302-327-9210
Fax: 202-827-0041

*Pro Hac Vice* Motions to be filed shortly.

# CERTIFICATE OF SERVICE

I hereby certify that I have caused a copy of the Amended Complaint to be served upon the following persons via first class mail, certified, return receipt requested, on March 21, 2017.

_Traci Buschner /wf_

Traci L. Buschner

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

| United States | Acting United States<br>Attorney General Dana Boente<br>United States Department of Justice<br>950 Pennsylvania Ave., N.W.<br>Washington, DC  20530<br><br>Acting United States<br>Attorney General Dana Boente<br>c/o Ms. Joyce R. Branda<br>Deputy Director, Commercial Litigation Branch - Fraud Section<br>U.S. Department of Justice<br>Ben Franklin Station<br>950 Pennsylvania Avenue<br>P.O. Box261<br>Washington, DC 20530<br>(202) 307-0231<br>(202) 616-3085<br><br>Acting U.S. Attorney for the District of Massachusetts<br>William D. Weinreb<br>John Joseph Moakley<br>United States Federal Courthouse<br>1 Courthouse Way, Suite 9200<br>Boston, MA 02210 |
| California | Attorney General Xavier Becerra<br>Office of the Attorney General<br>1300 "I" Street, Suite 1740<br>Sacramento, CA  95814<br>(916) 445-9555<br><br>Deputy Attorney General Rochelle C. East |

| | |
|---|---|
| | California Department of Justice<br>Bureau of Medi-Cal Fraud & Elder Abuse<br>1455 Frazee Road, Suite 315<br>San Diego, CA 92108<br>(916) 324-5435 |
| **Colorado** | Attorney General Cynthia H. Coffman<br>Ralph L. Carr Judicial Center<br>1300 Broadway, 10th Floor<br>Denver, CO  80203<br>(720) 508-6000<br><br>George A. Codding<br>Senior Assistant Attorney General<br>Office of Attorney General<br>1300 Broadway, 9th Floor<br>Denver, CO 80203 |
| **Connecticut** | Attorney General George Jepsen<br>State of Connecticut<br>55 Elm Street<br>Hartford, CT  06106-1774<br>(860) 808-5355 |
| **Delaware** | Attorney General Matthew Denn<br>Carvel State Office Building<br>820 North French Street<br>Wilmington, DE  19801<br>(302) 577-8400<br>(302) 577-2496 (fax)<br>Attorney.General@State.DE.US |
| **District of Columbia** | Attorney General Karl A. Racine<br>Office of the Attorney General<br>441 4th Street, NW<br>Suite 1100S<br>Washington, DC  20001<br>(202) 727-3400<br>(202) 347-8922 (fax)<br><br>Daniel A. Spiro (*in charge of qui tam litigation*)<br>Office of Attorney General<br>Senior Trial Counsel, Civil Litigation |

| | |
|---|---|
| | One Judiciary Square<br>441 4th Street NW<br>Washington, DC 20001 |
| **Florida** | Attorney General Pam Bondi<br>Office of the Attorney General State of Florida<br>The Capitol PL-01<br>Tallahassee,  FL 32399-1050<br>(850) 414-3300<br>(487) 487-9475 (fax)<br>Ag.mccollum@myfloridalegal.com<br><br>Mr. Jeff Atwater,<br>Florida's Chief Financial Officer,<br>Division of Legal Services<br>Florida Department of Financial Services<br>200 East Gaines Street<br>Tallahassee, FL  32399<br>(850) 413-3089<br>(850) 413-7460 (fax) |
| **Georgia** | Attorney General Chris Carr<br>Office of the Attorney General<br>State of Georgia<br>40 Capitol Square, SW<br>Atlanta, GA  30334-1300<br>(404) 656-3300 |
| **Hawaii** | Attorney General Douglas Chin<br>Department of the Attorney General<br>Honolulu, HI  96813<br>(808) 586-1500<br>(808) 586-1239 (fax) |
| **Illinois** | Lisa Madigan<br>Office of the Attorney General<br>State of Illinois<br>100 West Randolph Street<br>Chicago, IL 60601<br><br>Leo P. Schmitz<br>Director of the Illinois State Police<br>801 South 7th Street, Suite 110-S<br> Springfield, IL 62703 |

| | |
|---|---|
| **Indiana** | Attorney General Curtis T. Hill Jr.<br>Office of the Indiana Attorney General<br>Indiana Government Center South<br>302 West Washington Street, 5th Floor Indianapolis, IN 46204<br>(317) 232-6201<br>(317) 232-7979 (fax)<br>constituent@atg.in.gov<br><br>Allen Pope, Director, MFCU<br>Medicaid Fraud Control Unit of Indiana<br>Office of the Attorney General<br>8005 Castleway Drive<br>Indianapolis, IN  46250-1946<br>(317) 234-6662<br><br>Cynthia V. Carrasco<br>Inspector General of Indiana<br>315 West Ohio St., Room 104<br>Indianapolis, IN 46204<br>(317) 232-3850 |
| **Iowa** | Attorney General Thomas J. Miller<br>Hoover State Office Bldg.<br>1305 East Walnut Street<br>Des Moines, IA  50319<br>(515) 281-5164 |
| **Louisiana** | Attorney General Jeff Landry<br>1885 North 3rd Street<br>Baton Rouge, LA 70804-4095<br>(225) 326-6000<br><br>Kathy Kliebert<br>Office of the Secretary<br>Louisiana Department of Health and Hospitals<br>628 N. 4th Street, P.O. Box 629<br>Baton Rouge, LA 70821-0629 |
| **Maryland** | Attorney General Brian E. Frosh<br>Attorney General's Office, Maryland<br>200 St. Paul Place<br>Baltimore, MD  21202-2202 |

| | |
|---|---|
| | (410) 576-6300 |
| **Massachusetts** | Attorney General Maura Healey<br>Office of the Attorney General<br>State of Massachusetts<br>One Ashburton Place<br>Boston, MA  02108-1698<br>(617) 727-2200<br>(617) 727-3251 (fax) |
| **Michigan** | Attorney General William D. Schuette<br>Office of the Attorney General<br>State of Michigan<br>G. Mennen Williams Building, 7th Fl.<br>525 W. Ottawa Street<br>P.O. Box 30212<br>Lansing, MI  48909-0212<br>(517) 373-1110 |
| **Minnesota** | Attorney General Lori Swanson<br>Office of the Minnesota Attorney General<br>State Capitol, Suite 102<br>St. Paul, MN 55155<br>(651) 296-3353<br><br>Lori Swanson<br>Office of the Attorney General<br>State of Minnesota<br>1400 Bremer Tower<br>445 Minnesota Street<br>St. Paul, MN 55101-2131 |
| **Montana** | Attorney General Timothy C. Fox<br>Office of the Attorney General<br>State of Montana<br>Dept. of Justice Building<br>215 North Sanders Street, Third Floor,<br>P.O. Box 201401<br>Helena, MT  59620-1401<br>(406) 461-1264 |
| **Nevada** | Attorney General Adam Paul Laxalt<br>Office of the Attorney General |

| | |
|---|---|
| | State of Nevada<br>Old Supreme Court Building<br>100 North Carson Street<br>Carson City, NV  89701<br>(775) 684-1100<br>(775) 684-1108 (fax) |
| **New Hampshire** | Attorney General Joseph A. Foster<br>Department of Justice<br>Office of the Attorney General<br>33 Capitol Street<br>Concord, NH 03301<br>(603) 271-3658 |
| **New Jersey** | Attorney General Christopher S. Porrino<br>Office of the Attorney General<br>State of New Jersey<br>RJ Hughes Justice Complex<br>25 Market Street, P.O. Box 080<br>Trenton, NJ 08625-0080<br><br>Attorney General Christopher S. Porrino<br>c/o New Jersey Division of Criminal Justice<br>Medicaid Fraud Control Unit - FCA Unit<br>25 Market Street, Fifth Floor, West Wing<br>Post Office Box 080<br>Trenton, NJ  08625-0080<br>(609) 292-8740 |
| **New Mexico** | Attorney General Hector H. Balderas<br>408 Galisteo Street, Villagra Building<br>P.O. Box 1508<br>Santa Fe, NM  87504-1508<br>(505) 827-6000<br>(505) 827-5826 (fax)<br><br>Brent Earnest<br>Office of the Secretary<br>State of New Mexico<br>Human Services Department<br>P.O. Box 2348<br>Santa Fe, NM 87504-2348 |

| New York | Attorney General Eric T. Schneiderman<br>Office of the Attorney General<br>State of New York<br>The Capitol<br>Albany, NY 12224-0341<br><br>Attorney General Eric T. Schneiderman<br>c/o Managing Clerk's Office<br>Attn: MFCU: False Claims<br>120 Broadway, 24th Floor<br>New York, NY 10271<br>(212) 417-5300<br>serveAG@oag.state.ny.us |
|---|---|
| North Carolina | Attorney General Josh Stein<br>Office of the Attorney General<br>State of North Carolian<br>9001 Mail Service Center<br>Raleigh, NC  27699-9001<br>(919) 716-6400<br><br>F. Edward Kirby, Jr.<br>Special Deputy Attorney General<br>North Carolina Dept of Justice<br>Medicaid Investigations Unit<br>5505 Creedmoor Road, Suite 300<br>Raleigh, NC  27612<br>(919) 881-2328 |
| Oklahoma | Attorney General E. Scott Pruitt<br>Oklahoma Office of Attorney General<br>Attn: Medicaid Fraud Control Unit<br>313 NE 21st Street<br>Oklahoma City, OK 73105<br>(405) 522-2956 |
| Rhode Island | Attorney General Peter F. Kilmartin<br>Office of the Attorney General<br>State of Rhode Island<br>150 South Main Street<br>Providence, RI  02903<br>(401) 274-4400 |

| | |
|---|---|
| **Tennessee** | Attorney General Herbert H. Slattery, III<br>Office of the Attorney General & Reporter<br>State of Tennessee<br>425 5th Avenue North<br>Nashville, TN 37243<br>(615) 741-3491<br><br>Mary Elizabeth McCullohs, Assistant Attorney General of the State of Tennessee<br>425 Fifth Avenue North<br>Post Office Box 20207<br>Nashville, TN  37243<br>(615) 741-8126<br>Mary.mccullohs@ag.tn.gov |
| **Texas** | Attorney General Ken Paxton, Jr.<br>Office of the Attorney General<br>State of Texas<br>Capitol Station<br>300 West 15th Street<br>Post Office Box 12548<br>Austin, TX  78711-2548<br>(512) 463-2100 |
| **Vermont** | William H. Sorrell<br>Attorney General, State of Vermont<br>109 State Street<br>Montpelier, VT 05609 |
| **Virginia** | Attorney General Mark R. Herring<br>Office of the Attorney General<br>900 East Main Street<br>Richmond, VA  23219<br>(804) 786-2071 |
| **Washington** | Attorney General Robert W. Ferguson<br>Attorney General, State of Washington<br>1125 Washington Street SE<br>P.O. Box 40100<br>Olympia, WA  98504-0100<br>(360) 753-6200 |